TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00326-CV







Miami Independent School District, Appellant



v.



Dr. Mike Moses; Texas Education Agency; Hutto Independent School District;


and Mission CISD, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 97-12031, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING








 Appellant Miami Independent School District ("Miami ISD") filed suit seeking a
declaratory judgment that section 39.112 of the Texas Education Code, which makes exemplary
school districts exempt from "requirements and prohibitions" imposed under the Education Code,
removes exemplary school districts from the wealth equalization provisions contained in chapter
41 of the Education Code. Following a bench trial, the trial court held that it does not. Appellant
brings eight points of error challenging the final judgment rendered by the trial court in favor of
appellees, Dr. Mike Moses (1) and the Texas Education Agency (the "TEA"). We will affirm.


FACTUAL AND PROCEDURAL BACKGROUND

 Miami ISD is a rural school district located approximately eighty miles from
Amarillo; it consists of a single campus of only 192 students. While small, it is a relatively
wealthy district, largely due to local oil and gas production. Appellant's wealth per student (2)
exceeds $280,000, the maximum amount permitted under chapter 41 of the Texas Education Code. 
Tex. Educ. Code Ann. § 41.002(a) (West 1996) (hereinafter the "Code"). (3) Districts with a wealth
per student in excess of $280,000 are required to take any combination of the following actions
to achieve an equalized wealth level: (1) consolidation with other school districts; (2) detachment
of territory; (3) purchase of average daily attendance credit; (4) contracting for the education of
non-resident students; or (5) tax base consolidation with another school district. Id. § 41.003.

 The State Board of Education evaluates the performance of school districts (4) and
assigns each district one of four possible ratings: "exemplary," "recognized," "academically
acceptable," and "academically unacceptable." Id. § 39.072. Miami ISD received an
"exemplary" rating for the 1997-98 school year. It filed suit under the Uniform Declaratory
Judgments Act (5) in October 1997, seeking a declaration that it is exempt from chapter 41's wealth
equalization provisions due to its exemplary rating. Appellant's argument, both here and before
the trial court, is based on section 39.112 of the Code, which provides that a "school campus or
district that is rated exemplary is exempt from requirements and prohibitions imposed under this
code, including rules adopted under this code." Code § 39.112(a) (West 1996). Miami ISD
claims that chapter 41's wealth equalization provisions are among the "requirements and
prohibitions" imposed under the Code, and therefore its status as an exemplary district for 1997-98
allows it to avoid participating in the statewide wealth equalization system implemented by chapter
41.

 In December 1997, in conjunction with the trial court's issuance of a temporary
injunction in its favor, Miami ISD executed an agreement to purchase attendance credits under
section 41.002(a)(3). It then tendered into the registry of the court a total of $815,328,
representing the amount it owed under that section. After appellees filed an answer to appellant's
petition, Alice Independent School District and 126 other school districts statewide filed a plea in
intervention and a motion to consolidate the present action "with the cause entitled Edgewood
I.S.D. v. Meno, and bearing docket number 362,516." (6) Appellant moved to strike the plea.

 After a hearing on both motions, the trial court granted counsel for the 127
intervening districts time to secure a resolution from each district's board of trustees authorizing
counsel to represent its school district in this action. Ultimately, counsel filed proof of authority
for two districts, Hutto Independent School District and Mission Consolidated Independent School
District (the "Intervenors"), and the court overruled the motion to strike as to those two districts. 
The trial court granted amicus curiae status to the remaining 125 districts that had sought to
intervene. However, the court denied the motion to consolidate.

 Following a bench trial, the district court rendered a final judgment in favor of
appellees, declaring that Miami ISD is not exempt from chapter 41 and must comply with its
wealth equalization provisions. In its findings of fact and conclusions of law, the court reviewed
the legislative history of the excellence exemptions and wealth equalization provisions and
concluded that the legislature did not intend to immunize exemplary districts from the latter. It
observed that under appellant's interpretation of section 39.112, property-rich exemplary districts,
which already have significantly more money than other districts in the equalized system, would
receive even more money while property-poor exemplary districts would not. This reading of the
statute would cost the State approximately $56,000,000 annually, due to the State's obligation to
fund the equalized system. (7) The trial court also expressed skepticism at the idea that the
legislature intended to lavish money on districts that were already exceeding the State's educational
goals, at a time when the legislature was emphasizing accountability and trimming costs. 
Declaring appellant's construction "so inequitable as to raise serious questions about its
constitutionality," the court found that the language of section 39.112 does not compel the result
urged by Miami ISD. The trial court vacated the temporary injunction and ordered that the funds
in its registry be released to the TEA after thirty days.

 Miami ISD raises eight issues on appeal. In its first four issues, it claims the trial
court erred in rejecting the argument that section 39.112 makes exemplary school districts exempt
from chapter 41's wealth equalization provisions. In its fifth issue, appellant argues that the trial
court's judgment is based on hypothetical issues and constitutes an advisory opinion. In its sixth
issue, Miami ISD argues that the trial court misinterpreted uncontroverted evidence concerning
the lack of impact that this case would have on the constitutionality of the school finance system. 
In its seventh and eighth issues, appellant alleges that the trial court erred in failing to strike the
Intervenors' pleadings and in allowing the Intervenors to join this action.


DISCUSSION

 Appellant's first four issues all relate to the same central question: Does the
"requirements and prohibitions" language in section 39.112 make exemplary school districts
exempt from chapter 41's wealth equalization provisions? Before we address this question, a brief
review of the recent history of Texas's public school financing is helpful.

 In 1989, the Texas Supreme Court considered a challenge to the school finance
system in which about forty-two percent of total statewide education costs came from the State and
eight percent from various sources, including federal funds; the remaining fifty percent was raised
by school districts, mostly through the local ad valorem property tax system. See Edgewood
Indep. Sch. Dist. v. Kirby, 777 S.W.2d 391, 392 (Tex. 1989) (Edgewood I). The supreme court
held that due to the vast disparities in the tax bases of wealthy and poor districts and the resulting
inability of poorer districts to generate sufficient funds even at increased tax rates, the existing
system violated the "efficiency" mandate of article VII, section 1 of the Texas Constitution. See
id. at 393; Tex. Const. art. VII, § 1. The legislature's first two attempts to restructure the school
finance system in response to Edgewood I were rejected by the supreme court. See Edgewood
Indep. Sch. Dist. v. Kirby, 804 S.W.2d 491 (Tex. 1991) (Edgewood II); Carrollton-Farmers
Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489 (Tex. 1992) (Edgewood
III).

 In 1993, the legislature enacted Senate Bill 7, which created a two-tiered
educational finance structure known as the Foundation School Program. Act of May 28, 1993,
73d Leg., R.S., ch. 347, § 1.01, 1993 Tex. Gen. Laws 1479. Tier One's goal was to guarantee
sufficient financing for all school districts to provide a basic program of education that meets
accreditation and other legal standards. See Code § 42.002(b)(1)(A) (West 1996) (formerly Code
§ 16.002(b)). Tier Two created a guaranteed yield system, the goal of which was to provide each
school district with the opportunity to supplement the basic program at a level of its own choice. 
See Code § 42.301 (formerly Code § 16.301). A major funding source for the revised system is
the $280,000 cap on each district's per-student wealth, which "recaptures" funds in excess of the
cap and uses them to fund the equalization process. See Code § 41.002.

 Four years ago, the supreme court rejected constitutional challenges to Senate Bill
7's two-tiered system from both property-rich and property-poor school districts. See Edgewood
Indep. Sch. Dist. v. Meno, 917 S.W.2d 717 (Tex. 1995) (Edgewood IV). In Edgewood IV, the
supreme court described the $280,000 cap as the "cornerstone of Senate Bill 7's funding
mechanism," because it allows the State to "tap the reservoirs of taxable property situated in
property-rich districts." Id. at 734. However, the court specifically stated that its judgment
"should not be interpreted as a signal that the school finance crisis in Texas has ended," observing
that the system created by Senate Bill 7 "becomes minimally acceptable only when viewed through
the prism of history." Id. at 725-26. The previous system judged unconstitutional had insulated
concentrated areas of property wealth from being taxed to support the statewide public school
system, resulting in an inefficient system. As the supreme court recognized, Senate Bill 7
"continues the State's movement toward efficiency" by providing even the poorest districts with
vastly improved access to revenue. Id. at 734. With this background in mind, we turn now to the
interpretation of the phrase "requirements and prohibitions" found in section 39.112.


Standard of Review

 Miami ISD argues that the "requirements and prohibitions" language excuses
exemplary school districts from chapter 41's wealth equalization provisions. Appellees take the
position that section 39.112 refers only to "requirements and prohibitions" in the area of
education, not in school structure or finance. Representatives from the TEA testified at trial that
the agency has never interpreted the provisions of section 39.112 to exempt a school district from
chapter 41 as appellant urges.

 Our objective when we construe a statute is to determine and give effect to the
legislature's intent. See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc., 966 S.W.2d 482,
484 (Tex. 1998). We may consider the purpose and intent of the law, giving due deference to the
interpretation placed upon the provision by the agency. See Texas Citrus Exch. v. Sharp, 955
S.W.2d 164, 168 (Tex. App.--Austin 1997, no pet.) (op. on reh'g). We give serious
consideration to an agency's construction of a statute that it is charged with enforcing, so long as
the interpretation is reasonable and does not contradict the plain language of the statute. See id. 
In interpreting a statute, a court may consider (1) the object sought to be attained; (2) the
circumstances under which the statute was enacted; (3) the legislative history; (4) the consequences
of a particular construction; and (5) the administrative construction of the statute. See Tex. Gov't
Code Ann. § 311.023 (West 1988).


"Requirements and Prohibitions"

 Section 39.112 provides, in pertinent part:


(a) Except as provided by Subsection (b), a school campus or district that is rated
exemplary is exempt from requirements and prohibitions imposed under this code
including rules adopted under this code.


(b)  A school campus or district is not exempt under this section from:


 (1) a prohibition on conduct that constitutes a criminal offense;

 (2) requirements imposed by federal law or rule, including requirements for
special education or bilingual education programs; or

 (3) a requirement, restriction, or prohibition relating to:


 (A) curriculum essential knowledge and skills under Section 28.002 or
minimum graduation requirements under Section 28.025;

 (B) public school accountability as provided by Subchapters B, C, D, and
G;

 (C) extracurricular activities under Section 33.081;

 (D) health and safety under Chapter 38;

 (E) competitive bidding under Subchapter B, Chapter 44;

 (F) elementary school class size limits, except as provided by
Subsection (d) or Section 25.112;

 (G) removal of a disruptive student from the classroom under Subchapter
A, Chapter 37;

 (H) at risk programs under Subchapter C, Chapter 29;

 (I) prekindergarten programs under Subchapter E, Chapter 29;

 (J) rights and benefits of school employees;

 (K) special education programs under Subchapter A, Chapter 29; or

 (L) bilingual education programs under Subchapter B, Chapter 29.



Code § 39.112 (West 1996).

 Although appellant asserts that the language of section 39.112 is unambiguous,
merely reading the text of the statute does not reveal the scope of the phrase "requirements and
prohibitions imposed under this code." We will defer to the agency's interpretation as long as it
is reasonable and does not contradict the plain language of the statute. See Tarrant Appraisal Dist.
v. Moore, 845 S.W.2d 820, 823 (Tex. 1993); Texas Citrus Exch., 955 S.W.2d at 168. Since
nothing in the statute clarifies whether "requirements and prohibitions" includes chapter 41's
wealth equalization provisions, we believe that the TEA's interpretation is reasonable and does
not contradict the statute's plain language.

 Furthermore, we agree with appellees' contention that appellant's interpretation of
section 39.112 is unreasonable. Appellees ask whether exemplary schools would also be exempt
from governance by a board of trustees, election of trustees, provisions requiring written contracts
for teachers, provisions limiting the issuance of bonds only after authorizing elections, and a host
of other provisions. Miami ISD does not argue that the legislature intended exemplary schools
to be exempt from any of these "requirements and prohibitions," yet it insists that the plain
language of section 39.112 exempts it from the wealth equalization provisions. We believe that
the TEA's interpretation--that section 39.112 refers only to educational "requirements and
prohibitions"--is an inherently more reasonable construction.

 It is also the only interpretation supported by legislative history. The existing
evaluation and ranking system was enacted in 1989 by the 71st Legislature. See Act of May 29,
1989, 71st Leg., R.S., ch. 813, §§ 2.20-.22, 1989 Tex. Gen. Laws 3690-92 (codified at Tex.
Educ. Code Ann. § 39.072). The following year, the legislature enacted the provision exempting
exemplary districts from requirements and prohibitions imposed under the Education Code. See
Act of June 6, 1990, 71st Leg., 6th C.S., ch. 1, § 4.01 (codified at Tex. Educ. Code Ann.
§ 39.112(a)). A House Research Organization Report on the 1990 enactment of the exemplary
provisions refers to exemptions from "all state educational requirements and prohibitions"
(emphasis added). As the district court observed: "Districts that prove they can teach do not need
state regulation of their teaching." Appellant has not pointed us to any legislative history
indicating that the legislature intended to immunize high-achieving school districts from chapter
41's wealth equalization provisions. We agree with the district court's assessment that the purpose
of section 39.112 is to waive state educational oversight for districts that achieve the highest
standards of educational achievement.

 Further support for appellees' interpretation can be found in section 7.056 of the
Education Code, which provides that the Commissioner of Education can waive any
"requirement" or "prohibition" of the Code upon a district's written request. Code § 7.056(a)
(West 1996). Like section 39.112(b), sections 7.056(e) and (f) contain a list of nonwaivable
requirements and prohibitions that does not include chapter 41's wealth equalization provisions. 
Code §§ 7.056(e), (f). If appellant's interpretation were correct, these provisions would indicate
that the legislature intended to give the Commissioner the authority to undo the entire school
finance system. However, it is apparent from reading section 7.056(b)(1) that the "requirements"
and "prohibitions" subject to waiver are those that apply to a district's "achievement objectives"
and that section 7.056(d) specifies that the waiver is valid only as long as the district fulfills those
objectives and the district's achievement levels do not decline. Code §§ 7.056(b)(1), (d). We are
not persuaded that the legislature's failure to include similar clarifying language in section 39.112
should be interpreted to render the incredible result appellant seeks.

 When the legislature enacts a statute, it is presumed that "a just and reasonable
result is intended." Tex. Gov't Code Ann. § 311.021(3) (West 1988). We also acknowledge the
related rule that if more than one interpretation of a statute is available to a court, it must choose
one that does not cause serious doubts about the act's constitutionality. See Federal Sav. & Loan
Ins. Corp. v. Glen Ridge I Condominiums, Ltd., 750 S.W.2d 757, 759 (Tex. 1988). The district
court concluded that appellant's interpretation of section 39.112 is "so inequitable as to raise
serious questions about its constitutionality." We agree.

 The supreme court concluded in Edgewood IV that the Texas school finance system
is far from perfect, but had evolved sufficiently toward fairness and efficiency to survive
constitutional scrutiny. See Edgewood IV, 917 S.W.2d at 726-31. The court specifically
recognized chapter 41's wealth equalization provisions as the elements most responsible for
propelling the system on its slow journey toward efficiency. See id. at 734-35. Miami ISD's
interpretation would deflate the efficiency procured by the wealth equalization. If wealthier
districts that achieve exemplary status were no longer required to contribute to the statewide
system, the State would lose a critical funding mechanism while remaining obligated to provide
support to property-poor districts. Although money alone cannot ensure excellence in public
schools, it is an important component. The loss of approximately $56,000,000 annually in funds
that would have been recaptured under chapter 41 from exemplary schools like Miami ISD would
be a staggering assault on our constitutionally fragile school finance system.

 While section 39.112's "requirements and prohibitions" language is ambiguous,
we believe that the TEA's interpretation is not only reasonable, but considerably more logical than
the construction urged by appellant. The legislative history of section 39.112, the use of similar
phraseology elsewhere in the Education Code, and the absurd consequences that would follow
from appellant's interpretation point toward a single conclusion: the legislature did not intend to
make exemplary school districts exempt from the $280,000 per-student wealth cap. We further
agree that appellant's interpretation would raise serious constitutional concerns, given the history
of the school finance litigation and the role of the $280,000 cap in that ongoing struggle. 
Appellant's first four issues are overruled.


Hypothetical Issues

 In its fifth issue, Miami ISD argues that the trial court erred by basing its decision
on hypothetical issues not before the court and issuing an advisory opinion. In its sixth issue,
appellant alleges that the district court misinterpreted the uncontroverted evidence before it
concerning the lack of impact of this case on the constitutionality of the school finance system. 
We will consider these issues together.

 Miami ISD argues that the district court considered the consequences of appellant's
interpretation on other provisions that, like the wealth equalization provisions, are not specifically
enumerated in subsection (b) of section 39.112. Such regulations include: governance by a board
of trustees; election of trustees; provisions requiring written contracts for teachers; and provisions
limiting the issuance of bonds only after authorizing elections. Appellant urges that "district
courts are not in the business of giving advice, nor are they in the business of deciding cases upon
speculative, hypothetical or contingent situations," citing Coalson v. City Council of Victoria, 610
S.W.2d 744, 747 (Tex. 1980).

 We agree with the soundness of appellant's propositions. However, the trial court 
was not deciding hypothetical issues; the present controversy is quite real. In attempting to
determine the legislative intent behind section 39.112, the court simply considered the
consequences of appellant's construction of that statute, as it is authorized to do. See Tex. Gov't
Code Ann. § 311.023 (West 1988) ("In construing a statute, whether or not the statute is
considered ambiguous on its face, a court may consider among other matters . . . the consequences
of a particular construction."). The consequences considered by the trial court persuaded it to
favor appellees' construction of section 39.112.

 Miami ISD also argues that the district court's opinion was advisory because, of
the fourteen districts that were both subject to chapter 41 and rated exemplary for 1997-98, it is
the only district claiming exemption from the wealth equalization provisions. (8) Since the present
suit involves only $951,216, (9) appellant argues that the court erred in considering the $56,000,000
figure, the approximate amount of recapture that would be lost if all fourteen exemplary districts
were to receive the exemption appellant seeks. This argument is disingenuous. The trial court
was not required to turn a blind eye to the consequences of appellant's construction simply because
the other thirteen districts have declined to join appellant's suit. Nor are we. While appellant may
be technically correct that $951,216 is the amount at issue in this case, Miami ISD has apparently
never disputed that exempting all fourteen similarly situated districts would cause the State to lose
approximately $56,000,000 annually in recapture funds. The district court did not err in
considering this very real consequence of appellant's interpretation of section 39.112. We
overrule appellant's fifth and sixth issues.


The Intervenors

 In its seventh issue, Miami ISD argues that the trial court erred in failing to strike
the Intervenors' pleadings when Mr. Randall Wood failed to show authority to represent any of
the 127 districts seeking to intervene in the present action. Appellant cites to Rule of Civil
Procedure 12, which states:


 A party in a suit or proceeding pending in a court of this state may, by
sworn written motion stating that he believes the suit or proceeding is being
prosecuted or defended without authority, cause the attorney to be cited to appear
before the court and show his authority to act. . . . At the hearing on the motion,
the burden of proof shall be upon the challenged attorney to show sufficient
authority to prosecute or defend the suit on behalf of the other party. Upon his
failure to show such authority, the court shall refuse to permit the attorney to
appear in the cause, and shall strike the pleadings if no person who is authorized
to prosecute or defend appears.



Tex. R. Civ. P. 12. Appellant claims that the trial court erred in granting Mr. Wood ninety days
to secure resolutions authorizing intervention from each district's board of trustees.

 At the February 3, 1998 hearing on appellant's Rule 12 motion, Mr. Wood
produced evidence that a five-member committee had been organized in the mid-1980's to manage
lawsuits involving Edgewood issues. Mr. Wood took the position that he was authorized through
the "Edgewood committee" to represent the 127 districts then attempting to intervene. Counsel
for Miami ISD argued that Texas law requires a school district to act by and through its board of
trustees. See Favero v. Huntsville Indep. Sch. Dist., 939 F. Supp. 1281, 1294 (S.D. Tex. 1996),
aff'd, 110 F.3d 793 (5th Cir. 1997). Appellant also cites section 11.151 of the Education Code,
which provides that the trustees of an independent school district may sue and be sued in the name
of the district. Code § 11.151 (West 1996). The trial court did not rule on appellant's motion at
the hearing, announcing instead its intention to carry the motion.

 When trial began on March 30, Mr. Wood had received authorization from only
the Hutto and Mission Consolidated districts; the trial court overruled appellant's motion as to
those districts. The court also granted amicus status to the remaining 125 districts, which ruling
appellant has not challenged. Therefore, the court did not allow Mr. Wood to represent the 127
districts seeking intervention. We are not persuaded either that the trial court was required to rule
on the motion at the hearing, or that Rule 12 prohibited the court from granting Mr. Wood time
to attempt to secure authorization from each district's board of trustees. Nor has appellant cited
any authority for either of those propositions. We overrule appellant's seventh issue.

 In its eighth and final issue, Miami ISD claims that the trial court erred by failing
to grant appellant's motion to strike the Intervenors' plea in intervention. Appellant cites Texas
Rule of Civil Procedure 60, which provides that an intervening party may be "stricken out by the
court for sufficient cause on the motion of any party." Tex. R. Civ. P. 60. A person or entity
has the right to intervene in an action if: (1) the intervenor could have brought the action in his
own name, or (2) had the action been brought against him, he would have been able to defeat
recovery of some part thereof. See Guaranty Fed. Sav. Bank v. Horseshoe Operating Co., 793
S.W.2d 652, 657 (Tex. 1990). A trial court has broad discretion in deciding whether to allow an
intervention. See id.

 Miami ISD argues that under the facts of the present case, no judgment could have
been entered for the Intervenors on their pleas. Appellant cites City of Dallas v. Trammell, 96
S.W.2d 110 (Tex. Civ. App.--Dallas 1936), rev'd on other grounds, 101 S.W.2d 1009 (Tex.
1937), in support of its argument that the trial court erred in failing to strike the Intervenors'
pleas. It also cites Hopwood v. State, 21 F.3d 603 (5th Cir. 1994), for the proposition that the
Intervenors failed to show that they had an interest separate from that of appellees or that appellees
would not adequately represent them. We find both cases distinguishable.

 Trammell involved a suit by a retired police officer to compel the pension board to
restore his monthly pension payment to the amount it had been when he retired. In affirming the
trial court's judgment for the plaintiff, the court of appeals held that the trial court had not erred
in striking the pleas of a number of other pensioners who sought to intervene on behalf of the
defendant city. See Trammell, 96 S.W.2d at 113. Appellant relies on the court of appeals'
statement: "No judgment could have been entered for intervenors on their pleas, and the mere fact
that it was to their interest that [Trammell] should not prevail did not give them a right to
intervene." Id.

 First, we note that the court of appeals' judgment affirming judgment for the
plaintiff was reversed by the supreme court on another ground; therefore, the case is not binding
precedent. Second, Trammell's declaration that the intervenors' interest in the controversy was
not sufficient to permit intervention appears to conflict with the modern rule of intervention as
embodied in Rule 60. As this Court has explained:


Anyone may intervene in a legal proceeding to which he is not originally a party
in order to protect a right or interest which he has and which will be affected by the
litigation. An intervenor must show some present legal or equitable interest in the
subject matter which makes it proper for him to participate in the proceeding.



McCord v. Watts, 777 S.W.2d 809, 811 (Tex. App.--Austin 1989, no writ) (citing 1 McDonald
Texas Civil Practice §§ 3.46, 3.47 (rev. ed. 1981)). The intervenors have a real interest in this
dispute: their interest in a constitutionally efficient and equitable school system. It is for this
reason that school districts have both brought and intervened in suits since Edgewood I to
determine whether legislative enactments comport with Texas constitutional provisions on school
finance. See, e.g., Calhoun County Indep. Sch. Dist. v. Meno, 902 S.W.2d 748, 749 (Tex.
App.--Austin 1995, writ denied) (ninety-two districts intervened to prevent plaintiff district from
obtaining an extended reduction in the taxable value of the district's property by lengthening the
duration of an existing tax-abatement agreement with a commercial entity). There is no serious
question as to the Intervenors' interest in the present dispute.

 As the Intervenors point out, Hopwood involved an application of Federal Rule of
Civil Procedure 24. See Hopwood, 21 F.3d at 605. While adequacy of representation is an
element under Federal Rule 24, Rule 60 is not derived from the federal rule. See 1 McDonald
Texas Civil Practice § 5:78, at 603 n.619 (Diane M. Allen et al. eds., 1992). The parties have
not cited any cases applying an "adequacy of representation" requirement to an intervention under
Texas's Rule 60, and we have found none. Therefore, we do not find Hopwood persuasive in the
present circumstances. The trial court did not abuse its discretion in refusing to strike the
Intervenors' pleas.

 Even if it could be said that the trial court erred, we do not see how any such error
was harmful. Texas Rule of Appellate Procedure 44.1 provides that no judgment in a civil case
may be reversed unless the error complained of probably caused the rendition of an improper
judgment. Tex. R. App. P. 44.1(a)(1). Appellant does not argue that it has been harmed in any
way by the Intervenors' presence in the case, only that the trial court erred in failing to strike their
pleas. Assuming that the court's decision was in error, we are not persuaded that the error
probably caused the rendition of an improper judgment. Appellant's eighth issue is overruled.


CONCLUSION

 The trial court properly ruled that section 39.112 of the Education Code does not
make exemplary school districts exempt from chapter 41's wealth equalization provisions. 
Although the phrase "requirements and prohibitions" is ambiguous, we conclude that the TEA's
interpretation of that phrase to refer to educational requirements and prohibitions is a reasonable
one that does not contradict the plain language of section 39.112. It is also a construction
supported by both the legislative history of section 39.112 and the use of similar phraseology in
other sections of the Education Code. We conclude that adopting appellant's interpretation of
section 39.112 would strain the constitutionality of the current school financing system under
Edgewood IV and produce absurd results. Appellant's other issues are without merit. We
therefore affirm the trial court's judgment.




 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices Jones and B. A. Smith

Affirmed

Filed: March 25, 1999

Publish
1. Dr. Moses is a party in his status as Commissioner of Education.
2. "Wealth per student" is a term of art defined as "the taxable value of property . . . divided
by the number of students in weighted average daily attendance." Tex. Educ. Code Ann.
§ 41.001(2) (West 1996).
3. Unless otherwise noted, all statutory references herein are to the Texas Education Code.
4. The performance indicators used to evaluate each school district include the following: (1)
the results of TAAS tests, which assess competency in reading, writing, mathematics, social
studies, and science; (2) drop-out rates within the district; (3) student attendance rates; (4) the
percentage of graduating students who attain passing scores on the secondary exit-level tests; (5)
the percentage of graduating students who meet the course requirements established for the
recommended high school program by State Board of Education rule; (6) the results of the
Scholastic Achievement Test (SAT) and the American College Test (ACT); (7) the percentage of
students taking end-of-course assessment instruments; (8) the percentage of students exempted
from the assessment program; and (9) any other indicator the State Board of Education adopts. 
See Tex. Educ. Code Ann. § 39.051(b) (West 1996).
5. Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997).
6. It does not appear that any cause with this docket number was pending at the time of the
motion to consolidate; 362,516 was the docket number in another school district matter decided
by this Court in 1995. See Calhoun County Indep. Sch. Dist. v. Meno, 902 S.W.2d 748 (Tex.
App.--Austin 1995, writ denied).
7. Joseph Wisnoski, Coordinator for School Financing Fiscal Analysis for the TEA, testified
at trial that there are fourteen school districts that were both rated exemplary for 1997-98 and
subject to chapter 41; he further testified that the estimated amount lost from these schools
annually would total approximately $55,678,580.
8. Trial testimony established that the other thirteen districts all exercised options to reduce
their wealth under chapter 41.
9. Appellant deposited six checks for $135,888 into the registry of the court for a total deposit
of $815,328. However, another payment apparently became due after the filing of this appeal;
the $951,216 figure represents $815,328 plus another $135,888 payment.



ion of an improper judgment. Appellant's eighth issue is overruled.


CONCLUSION

 The trial court properly ruled that section 39.112 of the Education Code does not
make exemplary school districts exempt from chapter 41's wealth equalization provisions. 
Although the phrase "requirements and prohibitions" is ambiguous, we conclude that the TEA's
interpretation of that phrase to refer to educational requirements and prohibitions is a reasonable
one that does not contradict the plain language of section 39.112. It is also a construction
supported by both the legislative history of section 39.112 and the use of similar phraseology in
other sections of the Education Code. We conclude that adopting appellant's interpretation of
section 39.112 would strain the constitutionality of the current school financing system under
Edgewood IV and produce absurd results. Appellant's other issues are without merit. We
therefore