**TEXAS CITRUS EXCHANGE, a Texas Cooperative Association, Appellant,**

v.

**John SHARP, Comptroller of Public Accounts of the State of Texas; and Dan Morales, Attorney General of the State of Texas, Appellees.**

**No. 03–97–00010–CV.**

Court of Appeals of Texas, Austin.

Oct. 23, 1997.

Scott A. Walsh, Jarvis & Kittleman, P.C., McAllen, for Appellant.

Dan Morales, Atty. Gen., Nancy L. Prosser, Asst. Gen., Taxation Division, Austin, for Appellee.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

## ON MOTION FOR REHEARING

BEA ANN SMITH, Justice.

To address certain issues raised in the motion for rehearing we withdraw our earlier opinion and judgment issued August 14, 1997, and substitute this one in its place.

Texas Citrus Exchange sued the Comptroller for a refund of $49,593.26 in taxes paid on electricity used in juice production. The Comptroller determined that electricity Texas Citrus used in maintaining frozen ingredients as part of juice production was "warehousing," a commercial use subject to taxation under Texas Tax Code section 151.317 and Comptroller's rule 3.295. Texas Citrus claims that maintaining frozen concentrate is part of its manufacturing process and thus the electricity is used for a "noncommercial" purpose, exempt from taxation under the code and rule. The district court rendered judgment for the Comptroller. In four points of error, Texas Citrus challenges the imposition of the tax under the Tax Code and the Comptroller's rule. We will reverse the trial court's judgment and render judgment that Texas Citrus receive the refund.

## THE CONTROVERSY

Texas Citrus is a cooperative marketing association of over 200 citrus farmers. In addition to marketing the farmers' fresh fruit, the cooperative produces fruit juice at its factory in Mission, Texas. This all-natural juice does not contain preservatives and must adhere to strict quality standards regarding acidity, sugar content, and other factors. Because fruit harvested in different seasons varies in acidity and sugar content, the juices collected at different times of the year must be held for several months and then blended to produce a uniform juice product. Texas Citrus extracts juice from the fruit and removes the water to obtain a thick syrupy substance known as industrial concentrate.[1] Texas Citrus tests the industrial concentrate for sugar-acid ratios and sends it to a tank farm or freezer rooms to be frozen. It takes approximately seven days to freeze the concentrate. The tank farm maintains the concentrate at a temperature of ten degrees Fahrenheit; the freezer rooms keep the concentrate at eight degrees below zero.[2] The Comptroller agrees the electricity used to freeze the concentrate is exempt from taxation. The parties disagree as to whether the electricity used to keep the industrial concentrate frozen until it is used to make juice or sold as concentrate is taxable.

Texas Citrus sells a small portion of the frozen industrial concentrate to other producers, but most is used in the production of its own juice. In order to make the final product uniform, Texas Citrus must blend industrial concentrate from several batches of fruit harvested at different times during the season.[3] Once the blended concentrate matches the required characteristics, water is added and the mixture is heated to produce the final juice product. The juice is then canned, labeled, and boxed for shipment.

Subchapter H of Chapter 151 sets out taxable items that are exempted from the sales, excise, and use taxes imposed by the code. Tex. Tax Code Ann. § 151.301 (West 1992). Electricity is exempt from these

---

1. During the audit period, Texas Citrus produced orange, grapefruit, apple, and pineapple juice. In addition to using its own members' fruit to produce orange and grapefruit industrial concentrate, Texas Citrus also purchases some orange and grapefruit industrial concentrate. The audit period reflects higher than normal purchases of these concentrates due to a devastating freeze in 1981. Texas Citrus purchases all of the apple and pineapple industrial concentrate used in production of those juices.

2. Whether the concentrate is sent to the tank farm or a freezer room depends on its characteristics and is not pertinent to this dispute.

3. Texas Citrus's senior vice president testified that just mixing concentrate from the beginning of the season with concentrate from the end of the season will not produce the desired product. Rather, the production of the desired product requires concentrate from fruit harvested at several different times of year.

taxes *except* when it is employed for commercial use, which means "use by a person engaged in selling, warehousing, or distributing a commodity or a professional or personal service. . . ." *Id.* § 151.317(a), (c)(2) (West 1992). Commercial use does not include "processing tangible personal property for sale as tangible personal property. . . ." *Id.* 151.317(c)(2)(A)(i). According to the Comptroller, Texas Citrus warehouses frozen concentrate for up to six months and the electricity required to maintain the frozen concentrate is taxable. Texas Citrus insists that maintaining several batches of frozen concentrate for blending into a uniform final product is part of its nontaxable manufacturing process.

To aid in enforcing section 151.317, the Comptroller promulgated tax rule 3.295. *See* 34 Tex. Admin. Code § 3.295 (West 1988).[4] Under rule 3.295, the taxation of electricity is based on its predominant use: If over fifty percent of the electricity measured on a single meter is used for taxable purposes, all electricity is taxed; if over fifty percent is used for exempt purposes, all electricity is exempt. *Id.* § 3.295(d). During an audit of Texas Citrus for the period of April 1, 1987 to March 31, 1991, the Comptroller determined that Texas Citrus's predominant use of electricity for the first two years of the period was taxable. The Comptroller measured the electricity used to *lower* the temperature of the concentrate to the desired temperature and considered that electricity to be exempt. Since the electricity used in freezing made up less than fifty percent of Texas Citrus's total use of electricity, the Comptroller concluded Texas Citrus's predominant use of electricity was taxable. Unhappy with these findings, Texas Citrus initiated a second study for the same period. The supplemental study measured only the electricity used to *maintain* the concentrate at the necessary temperature levels. Texas Citrus argued that this maintenance electricity was also exempt, and if combined with the

freezing electricity measured in the original study, the predominant use of electricity for all four years would be exempt. The Comptroller adhered to its position that the maintenance electricity was taxable and imposed a tax of $49,593.26 for the predominantly commercial use of electricity in Texas Citrus's plant for the first two years. *See* Tex. Tax Code Ann. §§ 151.101, 151.317 (West 1992). Texas Citrus paid the tax under protest and requested a refund. *See id.* § 111.104. After the Comptroller denied its request, Texas Citrus brought suit in district court. *See id.* § 112.151.

The trial court held a bench trial to determine whether Texas Citrus was entitled to a refund. *See id.* § 112.054 (suit for tax refund is by trial de novo). For purposes of the suit, the Comptroller and Texas Citrus stipulated that if the maintenance electricity is exempt the predominant use of electricity for all four years is exempt from taxation. After hearing evidence detailing Texas Citrus's production process and hearing argument regarding the parties' interpretations of the statute, the trial court concluded that Texas Citrus was not entitled to the exemption.[5] In support of this conclusion, the trial court made Findings of Fact 5 and 6:

5. Texas Citrus is engaged in selling, warehousing, or distributing a commodity.

6. Maintaining industrial juice concentrate in a frozen state at a constant temperature is not processing the concentrate.

The district court rendered judgment for the Comptroller, and this appeal ensued.

## DISCUSSION

In points of error one and two, Texas Citrus challenges the legal and factual sufficiency of the evidence to support Findings of Fact 5 and 6. In points of error three and four, it contends the trial court erred in concluding that the disputed electricity is not

---

4. The parties stipulated that the 1987 and 1988 versions of the Comptroller's rules govern this case. The pertinent provisions of the two versions are identical; we cite to the 1988 version for convenience.

5. The trial court also concluded that rule 3.295(a)(7) is valid and consistent with the Tax Code. However, it is not the validity of the rule, but rather the Comptroller's interpretation of its rules, that is challenged in this appeal.

exempt and in rendering judgment for the Comptroller. Because the parties stipulated that the character of the disputed electricity will determine whether Texas Citrus is entitled to a refund, this appeal turns on the legal question whether Texas Citrus's maintenance of industrial concentrate at a constant frozen temperature is warehousing or is part of the manufacturing process.

In addressing this issue, we may consider the purpose and intent of the law, giving due deference to the interpretation placed upon the provision by the agency. *See ADP Credit Corp. v. Sharp*, 921 S.W.2d 490, 493 (Tex.App.—Austin 1996, writ denied); *Borden, Inc. v. Sharp*, 888 S.W.2d 614, 620 (Tex.App.—Austin 1994, writ denied); *Direlco, Inc. v. Bullock*, 711 S.W.2d 360, 363 (Tex.App.—Austin 1986, writ ref'd n.r.e.). We give serious consideration to an agency's construction of a statute that it is charged with enforcing, so long as the interpretation is reasonable and does not contradict the plain language of the statute. *Stanford v. Butler*, 142 Tex. 692, 181 S.W.2d 269, 273 (1944); *Borden, Inc.*, 888 S.W.2d at 620; *TEXALTEL v. Public Util. Comm'n*, 798 S.W.2d 875, 884 (Tex.App.—Austin 1990, writ denied).

Ordinarily, it is the taxpayer's burden to show it is entitled to an exemption. *North Alamo Water Supply Corp. v. Willacy County Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex.1991); *Sharp v. Chevron Chem. Co.*, 924 S.W.2d 429, 432 (Tex.App.—Austin 1996, writ denied). However, when the Comptroller relies on an exclusion from an exemption, this Court has held the burden shifts back to the Comptroller to prove the use fits within the exclusion. *Chevron Chem. Co.*, 924 S.W.2d at 432. In this case, the Tax Code exempts the purchase of electricity *except* when sold for commercial Use. Tex. Tax Code Ann. § 151.317. Under the *Chevron Chem. Co.* rationale, the Comptroller would have the burden to show the disputed electricity was used for commercial purposes.

The Comptroller argues that such a ruling would contradict our holding in *Direlco, Inc.*, 711 S.W.2d 360. We disagree. In *Direlco* this Court held that the term "commercial use" contained in a prior version of § 151.317

was ambiguous and we looked to legislative intent to determine the extent of the exemption for electricity. Again in *Sharp v. Tyler Pipe Industries, Inc.*, 919 S.W.2d 157 (Tex. App.—Austin 1996, writ denied), we emphasized the importance of determining the intent of the legislature in creating the manufacturing exemption to be construed. We recognized the following legislative purposes behind that exemption:

> (1) to encourage economic development in the state; (2) to avoid pyramiding of sales tax on successive buyers and sellers, which would result in the ultimate consumer paying sales tax on sales tax; and (3) to strike a balance between the policy of avoiding multiple taxation and the need to raise revenue for the state.

*Id.* at 161. We believe the same general purposes underlie the exemption for electricity at issue here. And as we did in *Direlco* and *Tyler Pipe*, we will rely on the intent of the legislature to determine whether the electricity in question was used for a commercial purpose or the exempt purpose of manufacturing.

We note that shifting the burden of proof to resolve disputes such as this can prove confusing. Here the Tax Code exempts electricity from taxation, then excludes commercial use from that exemption, then excludes certain kinds of commercial use from the statutory term-of-art "commercial use." *See* § 151.317(b)(2). For that reason we evaluate the reasonableness of the Comptroller's interpretation in light of the identified legislative intent, without relying wholly on the rationale of *Chevron Chem. Co.*, 924 S.W.2d 429.

An officer from the agency testified that the Comptroller has a policy of excluding from the exemption any use of electricity that does not produce a change in physical characteristics of the property. Stated another way, the Comptroller argues that the exempt activity of "processing" must produce a change in physical characteristics. Finally, the Comptroller relies on rule 3.295, which states that processing *excludes* "any action taken *to prolong the life of tangible personal property* or to prevent a deterioration of the

tangible personal property being held for sale." *See* 34 Tex. Admin. Code § 3.295(a)(7) (1988) (emphasis added). The Comptroller says that maintaining the concentrate in a frozen state prolongs its life and so this cannot be part of the exempt activity of processing.

By contrast, Texas Citrus says it holds the frozen concentrate for a period of months to permit the blending of juices harvested at various times during the growing season, a manufacturing step essential to its quality control. Texas Citrus says the concentrate is frozen not to prolong the life of property "held for sale" (the juice) but rather to maintain a key ingredient (the concentrate) for a period of time necessary to produce the quality of juice its customers demand. It contends that, under the rule, warehousing begins only after production is completed.[6]

Texas Citrus notes that the Comptroller has changed its position over the previous three audit periods: From 1979 to 1983, keeping the concentrate frozen was considered warehousing so the electricity was taxable; from 1983 to 1987, maintaining the frozen concentrate was considered part of the manufacturing process and the electricity was exempt; now, the Comptroller reverts to the view that this activity is warehousing and the electricity is taxable. Texas Citrus asks us to provide a consistent definition of what use of electricity is taxable.

 The Tax Code evinces an unmistakable policy of exempting from taxation the purchase and use of electricity in manufacturing products. In addition to section 151.317, section 151.318, entitled "Property Used in Manufacturing," exempts

tangible personal property used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation.

Tex. Tax Code Ann. § 151.318(a)(2) (West 1992). Section 151.318 defines "manufacturing" as

includ[ing] each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties (including packaging, if any) that it has when transferred by the manufacturer to another. *Id.* § 151.318(d). The Comptroller contends that section 151.318 does not involve electricity and is not relevant to this dispute. However, Comptroller's rule 3.300 promulgated pursuant to this section exempts "electricity ... when used directly in manufacturing." 34 Tex. Admin. Code § 3.300(a)(9) (1988). Both rules implementing sections 151.317 and 151.318 adopt the legislature's definition of manufacturing in discussing electricity. *See id.* §§ 3.295, 3.300. We conclude these provisions and rules must be read together. Statutory and rule provisions bearing on the same matters must be given a consistent and harmonious meaning. *Gulf States Utils. Co. v. Public Util. Comm'n,* 784 S.W.2d 519, 524 (Tex.App.—Austin 1990), *aff'd,* 809 S.W.2d 201 (Tex.1991). We construe statutes as a whole rather than through an examination of one isolated provision. *ADP Credit Corp.,* 921 S.W.2d at 493; *Estate of Padilla v. Charter Oaks Fire Ins. Co.,* 843 S.W.2d 196, 198 (Tex.App.—Dallas 1992, writ denied).

 Valid rules promulgated by the Comptroller have the force and effect of legislation. *Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976). Administrative rules are ordinarily construed in the same manner as statutes. *Id.* Texas Citrus challenges the Comptroller's application of rule 3.295 to its particular situation; it does not challenge the validity of the rule. An agency's interpretation of its own rules is entitled to deference by the courts. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Public Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 207 (Tex. 1991). Our review is limited to determining whether the administrative interpretation "is plainly erroneous or inconsistent with the regulation." *Gulf States,* 809 S.W.2d at 207 (quoting *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d

---

**6.** The Comptroller maintains that the phrase "held for sale" modifies only "prevention of deterioration" and "any action taken to prolong the life of tangible personal property."

48 (1977), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). If the Comptroller has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *Id.; Sam Houston Elec. Coop., Inc. v. Public Util. Comm'n*, 733 S.W.2d 905, 913 (Tex.App.—Austin 1987, writ denied).

■ The legislature limits taxation of electricity to the commercial uses of "selling, warehousing, or distributing a commodity." Rule 3.295 states that the use of electricity in manufacturing is a noncommercial use, exempt from taxation. The rule defines manufacturing to include every operation from the beginning of production until the product is completed and packaged for sale. Under this definition, warehousing can occur only after a product is completed. The Comptroller's rule is consistent with the statutory scheme; its application of the rule to Texas Citrus's use of electricity in producing juice is not.

■ Texas Citrus's position is consistent with both the legislative scheme and uniform application of rule 3.295. Under the scheme, warehousing means storage involved with the selling or distributing of the final commercial product, not storage that occurs incidentally during production. Indeed, rule 3.295 adds to the definition of manufacturing: *"When production is completed,* maintaining the life of tangible personal property or preventing its deterioration is not a part of the manufacturing process." 34 Tex. Admin. Code § 3.295(a)(7) (1988). Thus it is only electricity used to maintain or preserve *completed* property ready for sale that constitutes a commercial use subject to taxation. Texas Citrus uses electricity to keep its concentrate frozen during the middle of its process of converting fruit into all-natural juice that conforms to quality standards. The record contains an unchallenged finding of fact that no final juice products are held in either the tank farm or the freezer rooms. The juice is not completed and packaged until various batches of the concentrate are blended to achieve uniform ratios of sugar and acidity and then mixed with water to form the final product. The Comptroller's unbending poli-

cy of exempting as noncommercial only electricity used to change the physical characteristics of property does not comport with its own rule or the statutory scheme. Manufacturing is a broader term that *includes* processing; manufacturing need not always cause a change in the physical characteristics of the property. 34 Tex. Admin. Code § 3.295(a)(3) (1988). Accordingly, Texas Citrus's position that it uses electricity to keep the concentrate frozen as part of the manufacturing process is reasonable and consistent with the rule and the statute; the Comptroller's insistence that this activity is warehousing contradicts the rule.

■ The Comptroller focuses on one provision of its own rule to contradict the overall legislative scheme of exempting from taxation electricity used in manufacturing. By construing the tax-exemption for electricity too narrowly, the Comptroller defeats the legislative purposes underlying the exemption. "[T]he rule of strict construction of tax exemptions cannot be used as an excuse to stray from reasonableness." *Tyler Pipe*, 919 S.W.2d at 161 (citing 3A Norman J. Singer, *Sutherland Statutory Construction*, § 66.09 at 43 (5th ed.1992)). We do not defer to an administrative construction that deviates from the clear and express provisions of a statutory scheme. *Denton County Elec. Coop., Inc. v. Public Util. Comm'n*, 818 S.W.2d 490, 493 (Tex.App.—Texarkana 1991, writ denied). Moreover, we give greater deference to an agency interpretation that is long-standing and applied uniformly. *Amarillo Indep. Sch. Dist. v. Meno*, 854 S.W.2d 950, 954 n. 6 (Tex.App.—Austin 1993, writ denied); *see also Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 248 (Tex.1991).

The fact that Texas Citrus sells *some* of the industrial concentrate does not change the result. Texas Citrus is in the business of manufacturing all-natural juice, not of selling concentrate. The majority of the concentrate is maintained in the tank farm and freezing rooms for the purpose of meeting the quality standards of Texas Citrus's juice. The parties stipulated that small changes in the amount of concentrate held in either the tank farm or freezer rooms do not significantly affect the amount of electricity used to

maintain the temperatures at the required levels. Because the electricity is the same and the majority of it is used for an essential part of Texas Citrus's manufacturing process, we hold the electricity is a noncommercial use exempt from taxation under the Tax Code.

We reject the Comptroller's argument that the legislative acceptance doctrine requires us to embrace its interpretation of its rule. This doctrine states that when an administrative agency construes a statute in a new manner and the legislature re-enacts the statute without change, we should adopt the agency's construction. *Quorum Sales, Inc. v. Sharp*, 910 S.W.2d 59, 64 (Tex.App.—Austin 1995, writ denied). The doctrine has been applied to an agency's promulgated rules. *See Central Power & Light Co. v. Sharp*, 919 S.W.2d 485, 489 (Tex.App.—Austin 1996), *writ denied per curiam*, 40 Tex. Sup.Ct. J. 443, —— S.W.2d ——, 1997 WL 126855 (Tex. March 21, 1997); *Quorum Sales, Inc.*, 910 S.W.2d at 64. This doctrine does not apply to the Comptroller's unwritten policy in implementing one of its own rules, a policy on which the Comptroller has flip-flopped three times in thirteen years.

We hold the Comptroller's narrow interpretation of section 151.317 and its application of rule 3.295 to tax Texas Citrus's use of electricity to maintain industrial concentrate in a frozen state as part of its production of juice is unreasonable in light of the overall purpose of the statutory exemption for electricity. We sustain the appellant's four points of error.

## CONCLUSION

We overrule the Comptroller's motion for rehearing. We conclude that Texas Citrus is entitled to a refund of the taxes paid and reverse and render judgment in its favor.