**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS; Cities of Austin, Dallas, Fort Worth and Hereford; Office of Public Utility Counsel; and General Services Commission, Appellees.**

No. 03–99–00845–CV.

Court of Appeals of Texas, Austin.

Aug. 10, 2000.

Rehearing Overruled Dec. 14, 2000.

Jim Boyle, Law Offices of Jim Boyle, Austin, for Cities, et al.

Kristen Pauling Doyle, Office of Public Utility Counsel, Austin, for Office of PUC.

Amanda Atkinson Cagle, Asst. Atty. Gen., Natural Resources Division, Austin, for PUC.

Before Justices JONES, YEAKEL and PATTERSON.

J. WOODFIN JONES, Justice.

With revisions to the Public Utility Regulatory Act (PURA) in 1995, the legislature created a statutory alternative to traditional rate-of-return ratemaking.[1] Appellant Southwestern Bell Telephone Company (SWBT) elected to be governed under this new scheme, which provides instead for "incentive regulation." Pursuant to this scheme, SWBT applied to appellee, the Public Utility Commission (the Commission), for a rate-group reclassification.[2] The Commission denied the request in most respects, and SWBT sought judicial review in the district court.[3] The district court reversed and remanded in part, but affirmed the central portions of the Commission's order and effectively denied most of the relief sought by SWBT. The Commission did not appeal the portions of its order that were reversed by the district court. On appeal, SWBT raises four issues challenging portions of the district court judgment affirming the Commission's order. We will affirm in part and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a skirmish in the shift toward deregulation of telecommunication utilities. Historically, companies like SWBT have been regulated according to

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, P.C., Austin, for SW Bell.

1. *See* Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2045 (since recodified at Tex. Util.Code Ann. ch. 58).

2. *See* PURA, Tex. Util.Code Ann. § 58.058 (West 1998). For the sake of convenience, citations to PURA will be abbreviated as "PURA § ____."

3. *See id.* § 15.001 (West 1998).

traditional rate-of-return principles, which involve a complicated and speculative process of regulating costs and estimating a fair rate of return on investment. *See* PURA § 53.051 (West 1998).

In a 1977 rate-making proceeding under the traditional rate-of-return scheme, the Commission adopted a system of rate-group classifications for SWBT. Exchanges served by SWBT were divided into ten rate groups classified according to the number of working telephone lines in each exchange, and customers in each city were charged a tariff according to the rate group in which their exchange was classified. Rates progressively increased from the smaller groups to the larger, so customers in exchanges with fewer phone lines paid less than customers in exchanges with more phone lines. The higher tariffs represented a value-of-service principle: callers in an exchange with a larger number of phone lines could reach more telephones without paying long distance charges than could callers in a smaller exchange.

Over the years, the Commission has, in the course of rate-making proceedings, adjusted the number and boundaries of rate groups as needed to maintain exchanges' relative classifications and to prevent exchanges with significantly different numbers of telephone lines from ending up in the same rate group.[4] In so doing, the Commission used rate-group reclassification as a rate-design tool to help control how SWBT recovered its revenue requirement and to achieve equitable rates for all customers. Today, SWBT has eight rate groups instead of ten. The number and boundaries of the rate groups applicable to

SWBT have not been reclassified since 1990.

There is now a national trend toward utility deregulation and away from rate-of-return regulation. Accordingly, the legislature adopted what is now codified as PURA chapter 58, effective in September 1995, which allows instead for incentive regulation. The purpose of this chapter is to "provide a framework for an orderly transition from the traditional regulation of return on invested capital to a fully competitive telecommunications marketplace in which all telecommunications providers compete on fair terms." PURA § 58.001(1) (West 1998). A telephone company electing regulation under the incentive system agrees to cap its rates for four years and fulfill other infrastructure commitments. *See id.* §§ 58.021(b), .054 (West Supp.2000). In exchange, the company is able to garner more earnings if and when it increases its efficiency. A company regulated according to incentive regulation is not subject to a complaint, hearing, or determination regarding the reasonableness of its rates or revenues. *See id.* § 58.025 (West 1998). SWBT made this election in September 1995.

Chapter 58 includes three exceptions to the mandatory rate freeze: rate adjustments are allowed for (1) changes in FCC separations,[5] (2) certain companies with fewer than five million access lines in the state,[6] and (3) rate-group reclassification.[7] It is this last exception that is at issue in this case. Specifically, PURA provides that when a company has elected incentive regulation, "the commission, on request of the electing company, shall allow a rate group reclassification that results from access line growth." *Id.* § 58.058. The Com-

---

**4.** The proposed decision by the administrative law judge found that in the past, "the Commission raised the rate group upper limit when the failure to do so would put the exchange in question in a rate group with an exchange that had between 100,000 and 300,000 more [access lines]." In a previous docket number, for example, the upper boundary of Rate Group 5 was raised to prevent the

Austin exchange from being reclassified into Rate Group 6, which contains the Fort Worth and San Antonio exchanges.

**5.** *See* PURA § 58.056 (West 1998).

**6.** *See id.* § 58.057 (West 1998).

**7.** *See id.* § 58.058 (West 1998).

mission and SWBT disagree over the meaning of that section and the role of rate groups under the new regulatory scheme.

In December 1997, SWBT requested reclassification of 52 exchanges into different rate bands to reflect access-line growth since the last reclassification in 1990. The reclassification of all 52 exchanges would have resulted in an annual revenue increase of approximately $40 million. Most of that increase is attributable to the requested reclassification of exchanges in Austin (from Rate Group 5 to 6), Fort Worth (from Rate Group 6 to 7), and Dallas (from Rate Group 7 to 8). When several parties intervened to oppose the application, the proceeding was docketed as a contested case and referred to the State Office of Administrative Hearings for hearings before an administrative law judge (ALJ).

After proceedings before the ALJ, the Commission ultimately adopted most provisions of the ALJ's proposed decision, and while some rate-group reclassifications were allowed, the Commission's order denied SWBT most of the revenue increase it had sought through reclassification. SWBT appealed to the district court. The district court reversed and remanded in part,[8] but affirmed most of the Commission's order. SWBT has appealed, raising four issues regarding the affirmed portions of the district court's judgment.

First, the Commission adopted the portion of the ALJ's proposed decision holding that "it would be appropriate to increase the upper level of Rate Group 5 and Rate Group 7 to retain Austin and Dallas, respectively, in their current rate groups." By changing the boundaries, the Commission expanded the number of lines in those rate groups so that exchanges in Austin and Dallas no longer qualified for reclassification. SWBT complains that the Commission was bound to grant rate-group reclassifications based on increased line growth pursuant to PURA section 58.058 and that the Commission could not change the boundaries of the rate groups in doing so. SWBT asserts that, by changing the boundaries in a way that thwarted the requested reclassification of Austin and Dallas, the Commission improperly applied to the new incentive regulation scheme a rate-design tool appropriate only to rate-of-return regulation.

SWBT's second issue on appeal concerns the Commission's conclusion that SWBT could not benefit from pre-September 1995 access-line growth when it sought rate-group reclassification under the new incentive regulation scheme. In a stipulation reached in a prior rate-making case, SWBT agreed to refrain from seeking reclassification of any exchange to a higher rate group between 1991 and 1994.[9] SWBT then voluntarily extended the duration of the stipulation until September 1995, when SWBT elected incentive regulation under chapter 58 of PURA. Now that the term of the stipulation has expired, SWBT seeks to include line growth that occurred during the voluntary rate freeze in its reclassification of exchanges into new rate groups. The Commission held that line growth that occurred during the term of the stipulation should not be considered, and that section 58.058 was meant to apply only to line growth occurring *after* the election of incentive regulation.[10] The Commission's decision on this issue eliminated 27 of the 52 exchanges for

8. The district court reversed the Commission's order to the extent that it excluded access-line growth that the Commission found resulted from marketing efforts by SWBT, and remanded for a new hearing to take into account all access-line growth that was erroneously excluded.

9. The Commission's order suggests that the agreement not to reclassify exchanges "afford[ed] SWBT pricing flexibility for services facing competition while also imposing a rate cap on basic local exchange services."

10. This portion of the Commission's order is contrary to the recommendation of the ALJ.

which SWBT sought reclassification, including the Fort Worth exchange.

During the course of these administrative proceedings, SWBT sought but was denied the opportunity to conduct discovery about proceedings surrounding another rate-group application filed by the United Telephone Company of Texas, d/b/a Sprint. In its third issue on appeal, SWBT asserts that Sprint is a similarly situated carrier subject to the same statutes, that a different result was reached in that case, and that SWBT should have been allowed to discover and introduce evidence of the disparate treatment received by the two companies.

Finally, in its fourth issue, SWBT complains that there is no statutory basis for the portion of the Commission's order requiring SWBT to pay Cities' attorney's fees. Alternatively, if it is required to pay the attorney's fees, then SWBT argues that it should also be able to recoup those fees in the rates it charges its customers.

## DISCUSSION

### *Rate–Group Reclassification*

■ PURA provides an exception to the rate cap SWBT agreed to when it elected incentive regulation, mandating that "Notwithstanding Subchapter B,[11] the commission, on request of the electing company, *shall allow* a rate group reclassification that results from access line growth." PURA § 58.058 (emphasis added). Based on line growth that had occurred since its exchanges were last reclassified in 1990, SWBT sought rate-group reclassifications pursuant to that section. Rather than simply reclassifying exchanges using existing rate-group boundaries, the Commission responded to SWBT's request by changing the boundaries of two of the rate groups in order to keep the cities of Dallas and Austin in their existing respective rate

groups. In its first issue on appeal, SWBT protests that the Commission is not authorized to change rate-group boundaries because the language of section 58.058 is mandatory ("shall allow rate group reclassification") and so *requires* that the Commission reclassify exchanges once SWBT establishes that the exchanges have experienced access-line growth.

The Commission counters that rate groups have historically been used as a rate-design tool and are not intended as a means for giving SWBT an automatic rate increase. Therefore, the Commission claims that, consistent with past practice, it was free to reexamine and adjust the boundaries of SWBT's rate groups to maintain cities in their current rate groups and to prevent undue revenue increases as a result of reclassification. SWBT concedes that past rate-group reclassifications have involved modifying rate groups' upper and lower boundaries, but complains that carrying that practice over into incentive regulation violates the plain language of applicable sections within chapter 58. We agree with SWBT.

By adopting chapter 58, the legislature signaled a sea change in how telecommunications utilities that have elected incentive regulation are to be governed. Contrary to prior practice, section 58.025 states that a company electing incentive regulation "is not, under any circumstances, subject to a complaint, hearing, or determination regarding the reasonableness of the company's: (1) rates; (2) overall revenues; (3) return on invested capital; or (4) net income." PURA § 58.025 (West 1998). By changing rate-group boundaries to thwart SWBT's requested reclassification, the Commission was conducting precisely this kind of "reasonableness" inquiry.

In the findings of fact in its order, the Commission candidly admitted that it "adjusted the size of rate groups in order to

---

11. Subchapter B of chapter 58 governs the election of incentive regulation. *See* PURA §§ 58.021–.028 (West 1998 & Supp.2000). Subchapter C, in which section 58.058 is found, governs the basic network services provided under the incentive regulation scheme. *See id.* §§ 58.051–.063 (West 1998 & Supp.2000).

avoid placing two exchanges with significantly different numbers of [access lines] in the same group." Specifically, the boundaries were changed to retain Austin and Dallas in their current rate groups because "[t]o put Austin in the same rate group as exchanges with considerably more [access lines] would be a departure from the rate-design strategies used by the Commission in the past." This rationale necessarily involved an inquiry into the reasonableness of SWBT's rates or revenues—i.e., the Commission refused to move Austin and Dallas into higher rate groups because it determined that it would be *unreasonable* to charge the same tariff to customers in cities with significantly different numbers of access lines. Section 58.025 expressly prohibits such a determination of the reasonableness of rates or revenues.

 In this context, to give the term "rate group reclassification" the same meaning it had before incentive regulation was introduced would frustrate the intent of the legislature to free an electing utility from traditional ratemaking. Our goal in interpreting statutes is to ascertain and give effect to the legislature's intent. *See Sorokolit v. Rhodes*, 889 S.W.2d 239, 241 (Tex.1994). We do so by looking first to the plain language the legislature used. *See id.* Under the plain meaning rule, if a statute is clear and unambiguous we interpret it according to its common everyday meaning. *See Cail v. Service Motors, Inc.*, 660 S.W.2d 814, 815 (Tex.1983); *El Paso Indep. Sch. Dist. v. Sharp*, 923 S.W.2d 844, 846 (Tex.App.—Austin 1996, writ denied). By stating that the Commission "*shall allow* a rate group reclassification," section 58.058 plainly requires the Commission to reclassify exchanges into new rate groups when a utility has proven access-line growth. We do not believe the mandatory language of the statute contemplates a contemporaneous adjustment to the rate-group boundaries designed to prevent the very reclassification called for by section 58.058. To allow the Commission to avoid

the mandate in section 58.058 in this way would undermine the legislative intent expressed in the statute's plain language.

The Commission argues that the mandatory language in section 58.058 is tempered by other sections within the same chapter. For example, while section 58.058 states that the Commission "*shall* allow a rate group reclassification," section 58.059 states that "an electing company *may* request and the commission *may* authorize a rate adjustment under Section ... 58.058." PURA § 58.059 (West 1998). The Commission argues that, by using the permissive term "may," section 58.059 gives it the discretion to allow or disallow an adjustment requested by a utility under section 58.058. We disagree.

 The Code Construction Act offers guidance on how to interpret the terms "may" and "shall": "(1) 'May' creates discretionary authority *or grants permission or a power.* (2) 'Shall' imposes a duty." Tex. Gov't Code Ann. § 311.016 (West 1998) (emphasis added). The Commission wants us to read section 58.059 as giving it the discretionary authority to change rate-group boundaries when it considers a rate-group reclassification. But to interpret section 58.059 so broadly would, in effect, nullify the rate-group reclassification expressly mandated by section 58.058; by the Commission's reading of section 58.059, it would have the discretion to *never* allow a rate adjustment, even though section 58.058 was enacted specifically as a way for utilities to increase their otherwise-frozen rates. Where possible, we are required to interpret statutory language in a manner that harmonizes and gives effect to all relevant laws. *See Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 495 (Tex.1993); *see also Dial v. State*, 658 S.W.2d 823, 826 (Tex.App.—Austin 1983, no pet.) (statutory sections that "are not positively repugnant will each be construed so as to give effect to both, if possible"). Only by relying on the Code Construction Act's alternate definition and interpreting "may" as it is used

in section 58.059 to *grant permission or power* to the Commission to authorize a rate-group reclassification requested pursuant to section 58.058 do we harmonize the two sections.

We are similarly unpersuaded by the Commission's reliance on the language of section 58.055 that states, "(a) An electing company may increase a rate for a basic network service during [the rate freeze] only: (1) with commission approval that the proposed change is included in Section ... 58.058; and (2) as provided by Section[] ... 58.058." PURA § 58.055 (West Supp.2000). The Commission urges that this section gives it the discretion—but does not require it—to allow a rate adjustment to occur as part of a rate-group reclassification. As explained above, however, such an interpretation would render the mandatory language of section 58.058 meaningless. Because the legislature specifically allowed rate-group reclassification as an exception to a utility's agreed rate freeze and used mandatory language in directing the Commission to allow such reclassification, we believe that it intended rate-group reclassification requested pursuant to section 58.058 to be a largely mechanical process.

Under rate-of-return regulation, rate-group reclassification was used as a rate-design tool to keep access-line growth essentially revenue neutral. The mandatory language of section 58.058—combined with section 58.025's promise that SWBT "is not, under any circumstances, subject to a complaint, hearing, or determination regarding the reasonableness" of its rates or revenues—convinces us that rate-group reclassification cannot continue to be so used for utilities that opt for incentive regulation. *See* PURA § 58.025. Once the utility establishes that it has experienced sufficient line growth, "the commission shall allow a rate group reclassification that results from access line growth." *Id.* § 58.058. However reasonable the Commission's adjustments to the rate group boundaries might have been if conducted in a traditional rate-of-return ratemaking proceeding, they are not appropriate where, as here, SWBT is plainly not subject to an inquiry into the reasonableness of its rates. SWBT's first issue is sustained.

### Exclusion of Line Growth During Stipulation Period

■ SWBT next complains that when reclassifying exchanges into new rate groups, the Commission should not be able to exclude line growth that occurred prior to September 1, 1995. In its order on this issue the Commission explained:

> Prior to its election, SWBT was subject to the terms of its last rate case, Docket No. 8585, a non-unanimous stipulation to which SWBT was a party. The bargain struck and approved by the Commission in Docket No. 8585 afforded SWBT pricing flexibility for services facing competition while also imposing a rate cap on basic local exchange services. The final order in Docket No. 8585 explicitly prohibited SWBT from reclassifying any exchange to a higher rate group during the term of the stipulation: 1991 through 1994. SWBT then voluntarily extended the term of the stipulation until September 1995, at which time it elected incentive regulation under PURA.

No one disputes that SWBT complied with the terms of the stipulation and did not seek rate-group reclassification during the term of the agreement. Once the stipulation expired, however, SWBT sought to include line growth that occurred during that period through a "rate group reclassification that results from access line growth." PURA § 58.058. Although the ALJ sided with SWBT, the Commission refused to allow consideration of that line growth, holding instead that section 58.058 was meant to apply only to line growth occurring *after* an electing company chose to be regulated under incentive regulation. The district court affirmed the Commission's holding.

Though they reached opposite conclusions, the ALJ and the Commission both agreed that section 58.058 is not clear on its face. The statute merely provides for rate-group reclassification that results from access-line growth; it does not specify *the date from which* the line growth should be measured. An agency's construction of a statute that it is charged with enforcing is entitled to great weight, so long as the interpretation is reasonable and does not contradict the plain language of the statute. *See Texas Citrus Exch. v. Sharp,* 955 S.W.2d 164, 169 (Tex.App.—Austin 1997, no pet.); *Texas Ass'n of Long Distance Tel. Cos. (TEXALTEL) v. Public Util. Comm'n,* 798 S.W.2d 875, 884 (Tex. App.—Austin 1990, writ denied). SWBT asserts, and we agree, that the Commission's interpretation of section 59.058 is not reasonable and so is not entitled to deference.

Section 58.058 states that "the commission . . . shall allow a rate group reclassification that results from access line growth." What the Commission essentially seeks to do here is add a caveat to the plain language of this statute, so the statute requires it to allow "reclassification that results from access line growth *except when we choose not to count such growth.*" A court may not judicially amend a statute to add words that are not implicitly contained in the language of the statute. *See Jones v. Liberty Mut. Ins. Co.,* 745 S.W.2d 901, 902 (Tex.1988). "Only when it is necessary to give effect to the clear legislative intent can we insert additional words into a statutory provision." *Id.* (quoting *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 552 (Tex.1981)). There is no indication that the legislature intended for the Commission to create exceptions to section 58.058 that would ignore significant line growth, and the Commission's assertion that every access line in some exchanges will be counted while some lines in other exchanges may be ignored stretches logic.

The Commission's order concedes that "[t]here is no question that for exchanges that experienced growth in access lines after September 1, 1995, § 58.058 allows rate group reclassification," but goes on to say that allowing SWBT to count access-line growth prior to September 1, 1995 would "create[ ] a loophole for SWBT's earlier bargain under Docket No. 8585." The Commission held that "the earlier bargain creates a reasonable basis for distinguishing between pre–1995 access line growth and post–1995 access line growth for purposes of the relief sought in this case."

The district court focused more on retroactivity concerns, apparently reasoning that because statutes are presumed to apply only prospectively, in enacting section 58.058 the legislature could only have contemplated including prospective line growth. Utility rates, like any other legislation, can generally have only prospective application and cannot be used to recoup losses or gains incurred under rates set in prior proceedings. *See TEXALTEL,* 798 S.W.2d at 882. The district court judgment held that allowing SWBT to count line growth during the stipulation period and before it elected incentive regulation would effectively permit the utility to "reach back and take growth in access lines to increase the rates." Retroactivity concerns are misplaced here, however. A statute is not retroactive merely because it draws upon antecedent facts for its operation. *See Lewis v. Fidelity & Deposit Co.,* 292 U.S. 559, 571, 54 S.Ct. 848, 78 L.Ed. 1425 (1933); *American Home Assurance v. Texas Dep't of Ins.,* 907 S.W.2d 90, 94 (Tex.App.—Austin 1995, writ denied). Here, SWBT is seeking to apply the new statute only *prospectively* by counting its *current* number of access lines and classifying its exchanges into rate groups accordingly. This does not violate the general prohibition on giving a statute retroactive effect.

Perhaps the most compelling argument against the agency's interpretation of section 58.058 emerges by examin-

ing the absurd results reached under that interpretation. In determining the meaning of a statute, a court must consider the entire act, its nature and object, and the consequences that would follow from each construction. *See Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 249 (Tex.1991) (citing *Sayre v. Mullins,* 681 S.W.2d 25, 27 (Tex.1984)). Interpretations that would produce absurd results are to be avoided. *See id.* (citing *McKinney v. Blankenship,* 154 Tex. 632, 282 S.W.2d 691, 698 (1955)).

By the Commission's own description, rate-group reclassification is allowed because "a customer in a larger exchange is able to call or receive calls from a greater number of lines at no cost than can a customer in a smaller exchange, [so] the larger exchange has more value and should be priced higher." [12] Yet under the Commission's order, customers in an exchange that experienced line growth from 1991–1995 would pay less than customers in an exchange that has experienced significant growth since 1995 even if the two exchanges now have precisely the same number of access lines and would otherwise be classified in the same rate band. This is true merely because the Commission has made the decision to forever exclude access lines that were added during the stipulation term, a decision that bears no relationship to the purpose of using rate bands to reflect customers' cost of service. Like the ALJ, we "can find no reasonable basis, no ground of distinction, for treating comparably-sized exchanges differently." We sustain SWBT's second issue.

### Denial of Discovery Request

█ In its third point of error, SWBT complains that the Commission erroneously deprived it of the opportunity to discover and introduce evidence regarding a rate-group reclassification proceeding involving Sprint. Sprint has also elected incentive regulation, and according to

SWBT, Sprint filed its own application for rate-group reclassification just days before SWBT filed its application. In Sprint's case, however, the Commission approved the reclassification without reexamining the boundaries of Sprint's rate groups. Sprint had also previously agreed under a stipulation to cap local exchange rates, and the approved reclassification allowed Sprint to include line growth that occurred during the period of the stipulation. Because both companies were subject to the same statutory scheme of incentive regulation and both requested a rate adjustment under section 58.058, and because both companies had previously been subject to rate-freeze stipulations, SWBT asserts that the Commission subjected the two phone companies to disparate treatment. SWBT demanded the opportunity to discover and introduce evidence of the purportedly inconsistent treatment and claims that the Commission acted arbitrarily and capriciously in denying the request. It claims that the Equal Protection clauses of the United States and Texas constitutions are violated by the Commission's denial of SWBT's discovery request.

█ Even assuming that SWBT is correct in its assertions that it and Sprint are similarly situated in most ways material to this case, we do not believe that the Commission erred in denying SWBT's request. In contested case hearings, the Commission generally follows the Texas Rules of Evidence as they apply in non-jury civil cases. *See* Tex. Gov't Code Ann. § 2001.081 (West 2000); 16 Tex. Admin. Code § 22.141 (1999). It follows, then, that agency decisions on matters of discovery, like similar trial court rulings, will be disturbed only to remedy an abuse of discretion. *See Markham v. Diversified Land & Exploration Co.,* 973 S.W.2d 437, 441 (Tex.App.—Austin 1998, pet. denied). An agency decision will be reversed only if substantial rights of the appellant are prej-

12. The quoted language is from the ALJ's proposed decision and was adopted by the Commission in its final order.

udiced by the agency's abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174(2)(F).

The record reflects that discovery was denied primarily because Sprint's case was disposed of administratively. Commission regulations allow some tariff filings to be disposed of without going through the formal process of docketing them as contested case proceedings. *See* 16 Tex. Admin. Code § 22.33 (1999). Qualified proceedings may be approved by an ALJ without a hearing or action by the Commission. *See id.* § 22.32 (1999).[13] Because the Sprint case was disposed of according to these provisions, the ALJ held that "it is not precedent for this case, that these questions were not addressed, that the Commission didn't even issue that order.... And so it seems to me that the Commission never reviewed this. So I don't think the Commission is on record on this question." The ALJ went on to explain that the Sprint case "was a settled case, and historically settled cases are ... not generally used as precedent for future cases." We find adequate the ALJ's explanation of why she denied SWBT's discovery request and find no abuse of discretion in her decision. Nor do we find any fundamental violation of SWBT's constitutional rights in the denial of this discovery request. SWBT's third issue on appeal is overruled.

### Attorney's Fees

■ In its final issue on appeal, SWBT complains of the portion of the Commission's order requiring it to pay Cities' attorney's fees. In allowing municipal participation in ratemaking proceedings, PURA provides that:

(a) The governing body of a municipality participating in a ratemaking proceeding may engage rate consultants, accountants, auditors, attorneys, and engineers to:

(1) conduct investigations, present evidence, and advise and represent the governing body; and

(2) assist the governing body with litigation before the commission or a court.

(b) The public utility in the ratemaking proceeding *shall reimburse* the governing body of the municipality for the reasonable cost of the services of a person engaged under Subsection (a) to the extent the commission determines is reasonable.

*Id.* § 51.006 (West 1998) (emphasis added). Thus, SWBT is required to reimburse Cities for their attorney's fees incurred if these proceedings are deemed "ratemaking proceedings" and if the Commission finds that the costs are reasonable. In this case, the parties reached an agreement and SWBT has stipulated that the amount of fees requested by Cities was reasonable. However, SWBT argues that, because it has elected incentive regulation, by definition it is no longer subject to ratemaking proceedings and so the attorney's fee provision in section 51.006 cannot apply to the present dispute.

In the "definitions" section of PURA, which is applicable to all utilities, "ratemaking proceeding" is defined as "a proceeding in which a rate is changed." PURA § 11.003(17) (West Supp.2000). The definition of "rate" includes "any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a public utility for a service...." *Id.* § 11.003(16). The present case involves a requested change to a tariff that may be charged to certain customers on the basis of their classification into different rate groups. This is plainly a proceeding in which a rate—a tariff or classification—will be changed. SWBT's claim that these proceedings are not ratemaking proceedings is contradicted by the plain lan-

**13.** If the Commission receives a request to intervene in the tariff filing, then administrative disposition is no longer permitted and the proceeding must be docketed. *See* Tex. Admin. Code § 22.33(b)(6) (1999). This is what happened in SWBT's case.

guage of PURA. Thus, the mandatory language of PURA section 51.006 applies, and SWBT must reimburse Cities for their attorney's fees as ordered by the Commission.

SWBT next argues that, if it is required to pay Cities' attorney's fees, it should be allowed to raise its rates to recoup that expense. Under the previous regime of rate-of-return regulation, attorney's fees paid to municipalities in ratemaking proceedings were added to the utility's own expenses and became part of the utility's revenue requirement to be recovered through rates. *See West Tex. Utils. Co. v. Office of Pub. Util. Counsel*, 896 S.W.2d 261, 270–71 (Tex.App.—Austin 1995, no writ). Had it not elected incentive regulation, SWBT would clearly be allowed to recoup this expense in rates. However, no similar allowance is made under incentive regulation, and when it elected to be governed under this scheme SWBT agreed to freeze its rates subject to three narrow statutory exceptions.[14] An increase in expenses due to an order to pay attorney's fees incurred by municipalities in ratemaking proceedings is not one of the exceptions to the rate freeze created by the legislature; we therefore find no error in the district court's conclusion that PURA contains "no . provision that entitles [SWBT] to recover the attorneys' fees awarded to Cities in this case." While we are sympathetic to SWBT's complaint that this creates something of a statutory "catch 22," it is the province of the legislature and not this Court to address any ensuing inequity. *See Southern Pac. Transp. Co. v. Railroad Comm'n*, 592 S.W.2d 74, 77 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.) ("Deficiencies in the laws regulating an industry '. . . will not justify a court's excursion beyond its proper sphere in order to plug a hole or cure a supposed defect in the legislative scheme of things.' ") (quoting *State v. Reyna*, 160 Tex. 404, 333 S.W.2d 832, 838 (1960)).

SWBT's fourth issue on appeal is overruled.

### CONCLUSION

We hold that the district court erred in affirming the portions of the Commission's order that (1) allowed the Commission to change rate-group boundaries when it considered the rate-group reclassification requested by SWBT and (2) allowed the Commission to exclude from consideration access-line growth occurring during the period governed by a now-expired stipulation to a rate freeze. Those parts of the district court's judgment are reversed, and those causes of action are remanded to the district court with instructions to remand to the agency for further proceedings. We also hold that the district court did not err in affirming the portions of the Commission's order (3) denying SWBT's discovery request regarding the Sprint proceedings and (4) ordering SWBT to reimburse Cities for their attorney's fees without allowing a corresponding rate increase. Those portions of the district court's judgment are affirmed.

---

**14.** As already noted, rate adjustments are allowed only for some changes in FCC separations, for certain companies with fewer than five million access lines in the state, and for rate-group reclassification. *See* PURA §§ 58.056, .057, .058.