# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00548-CV

**Southwestern Bell Telephone Company, Appellant**

**v.**

**Public Utility Commission of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
### NO. GN100804, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING

Appellant Southwestern Bell Telephone Company (ASWBT@) appeals from a district-court judgment affirming a final order of appellee the Public Utility Commission of Texas (the ACommission@). Pursuant to the incentive-regulation provisions of the Public Utility Regulatory Act (APURA@),[1] SWBT applied for a rate increase for Anonpublished exchange@ service by means of an informational notice filing. *See* PURA '' 58.003(d), .152 (West Supp. 2002). The Commission, finding that nonpublished exchange service is a basic service, and therefore subject to a rate cap, rejected SWBT=s filing. *See id.* ' 58.054. The district court affirmed the Commission=s final order. SWBT appeals by one issue. We will reverse and remand.

### BACKGROUND

---

[1] The Public Utility Regulatory Act is codified as Title 2 of the Texas Utility Code. Tex. Util. Code Ann. '' 11.001-64.168 (West 1998 & Supp. 2002). The incentive-regulation provisions appear in sections 58.001-.302. *Id.* '' 58.001-.302.

This dispute arises from SWBT=s attempt to exercise pricing flexibility under the incentive-regulation scheme of PURA. *See id.* '' 58.001-.302 (West 1998 & Supp. 2002). Before 1995, public utilities in Texas were dominated by heavily regulated monopolies. *See City of Plano v. Public Util. Comm=n,* 953 S.W.2d 416, 419 (Tex. App.CAustin 1997, no writ). Companies like SWBT were regulated according to traditional rate-of-return principles, which involved a complicated and speculative process of regulating costs and estimating a fair rate of return on investment. *Southwestern Bell Tel. Co. v. Public Util. Comm=n,* 31 S.W.3d 631, 633-34 (Tex. App.CAustin 2000, pet. granted) (citing PURA ' 53.051 (West 1998)). However, in 1995, the legislature responded to the national trend toward deregulation and amended PURA to provide telecommunications companies with the option of becoming deregulated through a statutory transition process.[2] A telephone utility may choose to be regulated under the incentive scheme in chapter 58 of PURA by notifying the Commission in writing of its election and fulfilling corresponding infrastructure commitments. PURA ' 58.021 (West Supp. 2002). Companies choosing incentive regulation are commonly referred to as Aelecting companies.@ Under the 1995 legislation, services were divided into three categories: (1) basic network services, (2) discretionary services, and (3) competitive services.[3] This allowed electing companies the freedom to competitively price certain services in the market, while remaining subject to the Commission=s authority over the regulation of other services. In 1999

---

[2]   The policy of the incentive-regulation scheme is to Aprovide a framework for an orderly transition from the traditional regulation of return on invested capital to a fully competitive telecommunications marketplace in which all telecommunications providers compete on fair terms.@ *Id.* ' 58.001(1) (West 1998).

[3]   *See* Act of May 8, 1997, 75th Leg., R.S., ch. 166, ' 1, 1997 Tex. Gen. Laws 713, 864 (amended 1999) (current version at Tex. Util. Code Ann. ' 58.023 (West Supp. 2002)).

the legislature again amended PURA, continuing its efforts to reduce the authority of the Commission to regulate electing companies. The three categories of services were collapsed into two categories, which PURA now designates as basic and nonbasic services. *See* PURA ' 58.023 (West Supp. 2002). Basic services remain subject to a rate cap through September 1, 2005; nonbasic services may be priced competitively.

SWBT became an electing company on September 1, 1995, thereby committing to a rate cap on basic services until September 1, 2005. On November 13, 2000, SWBT filed an informational notice with the Commission expressing its intent to increase the monthly rate charged for nonpublished exchange service from $1.10 to $2.50.[4] Ordinarily, telephone utilities publish customer names, addresses, and telephone numbers in a directory, which is then distributed free of charge to all telephone subscribers. However, customers, who for various reasons wish their information to remain private, may pay an additional fee for the nonpublished exchange service, which removes their information from the directory and from directory assistance. In common parlance, such customers have Aunlisted numbers.@ The Commission rejected SWBT=s filing, basing its decision on its finding that nonpublished exchange service is included within Aprimary directory listings@ and is thus a basic service. *See id.* ' 58.051(a)(1).

---

[4] SWBT has not increased the rate charged for this service since 1985.

## DISCUSSION

In cases involving agency decision-making, we apply a deferential standard of review. *Nabisco v. Rylander*, 992 S.W.2d 678, 681 (Tex. App.CAustin 1999, pet. denied) (citing *Stanford v. Butler*, 181 S.W.2d 269, 273 (Tex. 1944); *ADP Credit Corp. v. Sharp*, 921 S.W.2d 490, 493 (Tex. App.CAustin 1996, writ denied)). When an agency is charged with enforcement of a statute, we give serious consideration to the agency=s construction, as long as the interpretation is reasonable and does not contradict the statute=s plain language. *Nabisco*, 992 S.W.2d at 681 (citing *Stanford*, 181 S.W.2d at 273; *Texas Citrus Exch. v. Sharp*, 955 S.W.2d 164, 168 (Tex. App.CAustin 1997, no pet.)).

By its sole issue on appeal, SWBT contends that the Commission=s classification of nonpublished exchange service as a basic network service contradicts the plain meaning and express terms of PURA. *See* PURA '' 58.051, .151. Section 58.051 specifies eleven services as basic network services, which are subject to SWBT=s rate cap. *Id.* ' 58.051(a). The first service listed is Aflat rate residential local exchange telephone service, including *primary directory listings* and the receipt of a directory and any applicable mileage or zone charges.@ *Id.* ' 58.051(a)(1) (emphasis added). The Commission found that nonpublished exchange service fits within primary directory listings and argues that it is a subset or attribute of primary directory listings.

Before the 1995 and 1999 amendments to PURA, regulation by the Commission was intended to act as a substitute for normal market competition. *City of Plano*, 953 S.W.2d at 419. By enacting the amendments, the legislature significantly changed the way telecommunications companies that elect incentive regulation are supervised. *Southwestern Bell*, 31 S.W.3d at 636 (ABy adopting chapter 58, the legislature signaled a sea change in how telecommunications utilities that

4

have elected incentive regulation are to be governed.@).  Electing companies are not subject to complaints, hearings, or determinations concerning their rates, revenues, or net income.  *Id.*  Rates are now determined by market forces rather than regulation by the Commission.  Therefore, we no longer begin our analysis with the presumption that a particular service is subject to regulation by the Commission.  Instead, when dealing with electing companies, we look to the enumerated services which are classified as basic and subject to the rate cap; if the service in question is not listed in section 58.051, we presume the service is nonbasic.  PURA ' 58.151(23) (stating that services which are classified as nonbasic include Aall other services subject to the commission=s jurisdiction that are *not specifically classified* as basic network services in Section 58.051@) (emphasis added).

Because nonpublished exchange service does not appear in section 58.051=s list, such service is presumed to be a nonbasic service.  The Commission=s argument that nonpublished exchange service is a subset or attribute of primary directory listings does not persuade us.  The Commission=s interpretation would broaden section 58.051(a)(1) to include services that Arelate to@ primary directory listings.  Such interpretation would have us read words into PURA that simply are not there, rendering section 58.151(23) meaningless and undermining the legislature=s clear deregulatory intent.  A[E]very word excluded from a statute must . . . be presumed to have been excluded for a purpose.@  *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).  Although Athe law permits the interpolation of words into a . . . statutory provision when necessary to achieve clear intent, . . . interpolation should not be resorted to when to permit it will defeat overriding intent.@  *Mauzy v. Legislative Redistricting Bd.*, 471 S.W.2d 570, 573 (Tex. 1971).

Conversely, we presume that the legislature intended each word to have a purpose. *Cameron,* 618 S.W.2d at 540 (citing *Eddins-Walcher Butane Co. v. Calvert,* 298 S.W.2d 93, 96 (Tex. 1957)). Every word, sentence, clause, and phrase of a statute should be given effect. *University of Texas v. Joki,* 735 S.W.2d 505, 508 (Tex. App.CAustin 1987, writ denied) (citing *Ex parte Pruitt,* 551 S.W.2d 706, 709 (Tex. 1977)). Construction of a statute that would make a provision a useless appendage is not favored by law. *Carson v. Hudson,* 398 S.W.2d 321, 323 (Tex. Civ. App.CAustin 1966, no writ). Although we may defer to an agency=s statutory interpretation, we do not do so when that interpretation is unreasonable. *Nabisco,* 992 S.W.2d at 681. We determine the legislature=s intent from the plain and common meaning of the words used. *St. Luke=s Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997) (citing *Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 (Tex. 1993); *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 352 (Tex. 1990)). The legislature has written clearly: basic services are only those *specifically classified* as such. The legislature=s requirement of specific classification leaves no room for the Commission or this Court to infer subsets or attributes not apparent from the basic-network-services description found in section 58.051(a). ACourts must take statutes as they find them. More than that, they should be willing to take them as they find them.@ *Simmons v. Arnim,* 220 S.W. 66, 70 (Tex. 1920) (quoted in *Agbor,* 952 S.W.2d at 505). The same is true of the Commission. We are convinced that the overriding intent of the legislature in enacting the amendments to PURA was to permit an electing company great latitude in its operations and rates, except as proscribed by the amendments themselves. Those amendments place only A*flat rate* residential local exchange telephone service@ under SWBT=s rate cap. PURA ' 58.051(a)(1) (emphasis added). An electing company must provide primary directory

**6**

listings as part of its residential local exchange service. *Id.* SWBT has charged its customers an additional fee for nonpublished exchange service both before and after becoming an electing company. Thus, there has historically been a difference between published primary directory listings and nonpublished exchange service. We find nothing in PURA to indicate that the legislature intended an electing company to cease charging an additional fee for nonpublished service.

Finally, the Commission asserts that because section 58.051(a)(1) refers to primary directory *listings* in the plural, the term must include published as well as nonpublished exchange services. SWBT responds that the legislature was merely recognizing that an SWBT customer could be entitled to more than one published listing per family within the flat rate. We agree with SWBT.

A plain reading of PURA leads to the conclusion that Aflat rate residential local telephone exchange service@provides a customer of SWBT with a bundle of telephone utility services for which the customer pays a flat rate. One such service is a published listing in SWBT=s directory. If the customer wishes to change the bundle, such as having his listing nonpublished, the change is not under SWBT=s rate cap, and SWBT may charge separately for the service. We hold that the Commission=s interpretation is unreasonable and contrary to the plain language of the statute.

SWBT further argues that the Commission=s decision should have been guided by SWBT=s tariff which lists nonpublished exchange service as a service separate from primary directory listing. As is relevant here, a tariff is a document prepared by a public utility and filed with the Commission that lists the utility=s services and the rates the utility charges its customers for those services. *See Southwestern Bell Tel. Co. v. Metro-Link Telecom, Inc.,* 919 S.W.2d 687, 691 (Tex. App.CHouston [14th Dist.] 1996, writ denied). SWBT contends that its tariff and the tariffs of other

**7**

utilities have the binding force and effect of law. The Commission disagrees, arguing that the legislature did not intend for utilities to bind the Commission with their tariffs. We acknowledge that tariffs may have some evidentiary value if they were relied upon by the legislature in determining which services were to be basic and which were to be nonbasic. However, because we have held that the Commission=s interpretation of nonpublished exchange service as a basic service is contrary to the plain meaning of PURA, we do not rely on the tariff in reaching our decision.

## CONCLUSION

We sustain SWBT=s issue, reverse the judgment of the district court, and remand this cause to the district court with instructions to remand to the Commission for further proceedings not inconsistent with this opinion.

Lee Yeakel, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Reversed and Remanded

Filed: June 6, 2002

Publish

8