

# ATTORNEY GENERAL OF TEXAS

## GREG ABBOTT

January 5, 2005

The Honorable Eddie Lucio Jr.
Chair, Senate Committee on International
   Relations and Trade
Sam Houston Building, Room 475
Post Office Box 12068
Austin, TX 78711

Opinion No. GA-0290

Re: Whether the Texas Commission on Environmental Quality is authorized to raise the environmental cleanup level at a specific site, and if so, what procedures must it follow (RQ-0245-GA)

Dear Senator Lucio:

You pose questions pertaining to the authority of the Texas Commission on Environmental Quality ("TCEQ" or "commission") to raise the environmental cleanup level at a particular site in Texas. You inform us that the United States Environmental Protection Agency ("EPA") and TCEQ are "currently taking public comment on the Administrative Record File for the ASARCO/El Paso Metals site [("Site")] in El Paso County."[1] You provide us with a copy of a public notice issued by EPA, Region 6, in which EPA proposes to "change the cleanup level for soils lead contamination from the current 500 parts per million (ppm) to 640 ppm based on recent site studies and information." EPA Notice, *supra* note 1. In your letter, you refer to TCEQ regulations that establish the current "human health residential soil protective concentration level [for lead] at 500 ppm." *Id.* at 1 (citing 30 TEX. ADMIN. CODE § 350.76 (2004)). The proposed change prompts you to ask whether:

> [g]iven the concentration levels under Rule § 350.76, TAC, does TCEQ have the authority to raise the cleanup level at the El Paso County Metals site from 500 ppm to 640 ppm? Can TCEQ grant a variance such that it changes the cleanup level at a specific site, while the level at other sites remains the same? If TCEQ has the authority to change these levels, what process or guidelines must the agency follow, if any? If a federal agency raises the concentration levels for remediation, would the state agency have to make [conforming] changes to their rules?

---

[1]Letter and attached copy of EPA Notice from Senator Eddie Lucio Jr., Chair, Senate Committee on International Relations and Trade, to Honorable Greg Abbott, Texas Attorney General, at 1 (July 12, 2004) (on file with Opinion Committee, *also available at* http://www.oag.state.tx.us) [hereinafter "Request Letter" and "EPA Notice"].

*Id.* We provided interested parties an opportunity to comment on your request. Neither EPA nor TCEQ provided briefing to this office regarding the cleanup activities at the Site or the legal issues raised by your request.

Your question assumes that any cleanup or remediation of a site will not return the site to its pristine condition, but will instead allow a certain amount of a contaminant to remain. We understand the reference to "cleanup level" to be the amount of a particular contaminant that will be allowed to remain at the site. For instance, a 500 ppm lead cleanup level contemplates that a concentration of lead in the amount of 500 ppm will remain, while a 640 ppm lead cleanup level allows a concentration of 640 ppm to remain. There is an inverse relationship between the cleanup level and the amount of contaminant that is removed. A higher cleanup level means less contaminant needs to be cleaned up or removed. A lower cleanup level would require a greater amount of contaminant to be removed or cleaned up.

## I.    Background

### A.    ASARCO/El Paso Metals Site

You do not provide us with much information regarding the Site. From documents found on EPA's website, we have learned that the Site includes residential properties located near the ASARCO property in the City of El Paso that are contaminated with arsenic and/or lead.[2] Testing results in 2001 indicated that lead levels in the residential soil at the Site were as high as 1,700 ppm.[3] *See* EPA Memo, *supra* note 2, at 2.

### B.    Removal Action under CERCLA

We have also learned from EPA's website that the current action at the Site is a Removal Action[4] pursuant to the federal Comprehensive Environmental Response, Compensation

---

[2]*See* Memorandum from Myron O. Knudson, P.E., Director, Superfund Division (6SF), Environmental Protection Agency, to Marianne L. Horinko, Assistant Administrator, Office of Solid Waste and Emergency Response, Environmental Protection Agency, at 1 (Mar. 11, 2003) *available at* www.epa.gov/Arkansas/6sf/pdffiles/el_paso _memo.pdf [hereinafter EPA Memo].

[3]Generally, lead contamination in residential soil comes from mining and milling sites, primary and secondary smelters, battery manufacturing and recycling facilities, and paint manufacturers. *See* United States Environmental Protection Agency, Lead in Paint, Dust & Soil, Basic Information, *available at* www.epa.gov/opptintr/lead/leadinfo.htm. Lead will remain in soil indefinitely. "Lead poisoning can cause, or be associated with, neurological damage, mental retardation, cerebral palsy, seizures, visual-motor deficiencies, behavioral problems, and even death." Daniel G. LeVan, *Landlord Liability for Lead Poisoning of Tenant Children Caused by Defects in Premises,* 70 U. DET. MERCY L. REV. 429, 430-31 (1992). The effects of lead poisoning are permanent. *See id.* at 431. Low concentrations of lead blood levels can permanently lower a child's intelligence quotient. *See id.*

[4]A "Removal Action" involves the cleanup or removal of released hazardous substances from the environment. 42 U.S.C. § 9601(23). In contrast, a "Remedial Action" means "those actions consistent with permanent remedy taken instead of or in addition to removal actions . . . to prevent or minimize the release of hazardous substances so that they do not migrate." *Id.* § 9601(24).

and Liability Act, 42 U.S.C. §§ 9601-9675 ("CERCLA"), undertaken to remove the arsenic and/or lead contaminated soils found on numerous residential properties. *See* EPA Memo, *supra* note 2, at 1. Better known as the federal Superfund because of the funding provided by the Hazardous Substance Superfund ("Superfund"), *see* 42 U.S.C. § 9601(11), CERCLA allows EPA to clean up or remediate contaminated sites with funding from the Superfund,[5] and later seek reimbursement from responsible parties. *See id.* § 9607. As of March 11, 2003, the Site was being evaluated for inclusion as a Remedial Action on the National Priorities List. *See* EPA Memo, *supra* note 2, at 1; *see also infra* note 6.

The public notice that prompts your question states that EPA and TCEQ are cooperating at the Site. Because the notice was published by EPA and directs comments be made to EPA, and because the Site information is found on EPA's website and not on TCEQ's website, we assume that EPA, not TCEQ, is the lead agency at the Site conducting or overseeing the Removal Action.[6]

CERCLA does not establish quantitative cleanup levels, but instead utilizes cleanup levels from state and other federal sources. *See* 42 U.S.C. § 9621. Because CERCLA incorporates certain state requirements, where a Texas site is involved, Texas cleanup levels such as the one found in section 350.76(c)(1) are relevant.

### C.     Rule 350.76(c)(1)

Texas Administrative Code, title 30, section 350.76(c)(1) ("Rule" or "Rule 350.76(c)(1)") is contained in TCEQ's Texas Risk Reduction Program ("TRRP") rule.[7] *See generally* 30 TEX. ADMIN. CODE §§ 350.1-.135 (2004). To put your question in context, it is helpful to generally understand the operation and goal of the TRRP. The TRRP is a comprehensive rule designed to set cleanup levels for environmental contamination in the State of Texas. *See id.* § 350.2(a). Texas has a multitude of environmental regulation and cleanup programs, including the State Superfund, Voluntary Cleanup, Petroleum Storage Tank, Industrial and Hazardous Waste, and Underground Injection Control programs. *See* 24 Tex. Reg. 7437, 7438-39 (1999).[8] The various programs deal with different modes of contamination and different kinds of substances. Instead of

---

[5]Only releases included on the National Priorities List are eligible for Superfund-financed Remedial Actions. Superfund financing of Removal Actions is not limited to sites listed on the National Priorities List. *See* 40 C.F.R. § 300.425.

[6]With respect to each site, the designated lead agency is required to define potential federal and state cleanup standards and other criteria to be considered. *See id.* § 300.430(b)(9). The lead agency is the agency that plans and implements the Remedial or Removal Action at a federal Superfund site, and may include a state acting pursuant to a contract or other agreement. *See id.* § 300.5. This is to be distinguished from a state Superfund cleanup under the jurisdiction of state law. *See, e.g.,* TEX. HEALTH & SAFETY CODE ANN. §§ 361.181-.188, 361.272 (Vernon 2001 & Supp. 2004-05).

[7]Your question assumes that the Site is subject to the TRRP rule as opposed to being grandfathered under the TRRP's predecessor rule. *See* Request Letter, *supra* note 1, at 1. The Rule's general applicability date is May 1, 2000. *See* 30 TEX. ADMIN. CODE § 350.2 (2004). We do not question this assumption.

[8]*See also* http://www.tceq.state.tx.us/nav/cec/cleanups.html.

having different cleanup standards for each respective program, the TRRP serves as a central (and consistent) rule for the cleanup process for all specified remediation programs. *See* 30 TEX. ADMIN. CODE § 350.2 (2004). The TRRP does not use the terms pollution or contaminant, but rather uses the term of art "chemicals of concern." *Id.* § 350.2(a). A chemical of concern is

> [a]ny chemical that has the potential to adversely affect ecological or human receptors due to its concentration, distribution, and mode of toxicity. Depending on the program area, chemicals of concern may include the following: solid waste, industrial solid waste, municipal solid waste, and hazardous waste as defined in the Texas Health and Safety Code . . . .

*Id.* § 350.4(11).

The TRRP sets out a five-part process to be followed once a release of chemicals of concern has been identified and reported under the respective state program. *See id.* § 350.3. Generally, a party undertaking to clean up or remediate a property must (1) conduct a property assessment,[9] (2) determine critical protective concentration levels[10] of chemicals of concern that can remain in or on the property and still be protective of human and ecological health, *see id.* §§ 350.71-.79, (3) develop a response action to attain objectives under one of two remedy standards,[11] (4) develop and submit required reports to TCEQ, and (5) implement the response action. *See id.* § 350.3. Rule 350.76(c)(1) is a component of Step 2—the determination of protective concentration levels. *See id.* § 350.3(2). The protective concentration level is the cleanup standard. *See id.* § 350.71(a) ("If [protective concentration levels] are exceeded for certain [chemicals of concern], then [after further evaluation and comparison] . . . a response action must be initiated.").

Generally, Step 2 requires a person involved in the cleanup of a release of chemicals of concern to determine how much of the particular chemical of concern may remain in or on the property, and still protect human health and ecological health. *See id.* The TRRP establishes three tiers under which this calculation can be made. *See id.* §§ 350.71, .75. Each successive tier calls for incrementally increased consideration of site-specific information and sophistication in the protective concentration level calculation process. *See id.* § 350.71(a). A party must use one of the

---

[9]A property assessment identifies chemicals of concern, locates human and ecological receptors, and characterizes the geological and hydrogeological features of a site. Upon completion of the property assessment, there should be a clear understanding of the chemicals of concern present, the environmental media impacted by each chemical of concern, and the nature of any exposure to human and ecological receptors posed by the chemicals of concern. *See* 30 TEX. ADMIN. CODE §§ 350.51-.55 (2004).

[10]The protective concentration level is the "concentration of a chemical of concern which can remain within the source medium and not result in levels which exceed the applicable human health risk-based exposure limit or ecological protective concentration level at the point of exposure for that exposure pathway." *Id.* § 350.4(68).

[11]The TRRP allows a person to select between Remedy Standard A and Remedy Standard B. Under Remedy Standard A, the property must be cleaned up by removing or decontaminating the chemical of concern. *See id.* § 350.32. Remedy Standard B allows for the elimination of exposure to a chemical of concern through the use of control measures. Controls can be physical, such as a parking lot placed over contaminated soils, or institutional, such as a deed notice which identifies the problems with the property. *See id.* § 350.33.

tiered approaches to calculate the protective concentration level, but is given some flexibility in selecting which tier to use. Any chemical of concern existing at a site above the protective concentration level must be the subject of a response action (Steps 3 & 5)—that is, cleaned up. *See id.*

There are a few chemicals of concern that TCEQ has segregated for special treatment "due to the unique nature of the toxicity and/or exposure," *id.* § 350.76(a), which chemicals are excluded from the three-tiered calculation approach. Instead, the TRRP mandates a more specific approach (a numeric level or formula) for these particular chemicals. *See id.* Lead is one of these segregated chemicals of concern, *see id.* § 350.76(a)(1)(B), and TCEQ has affirmatively established a protective concentration level of 500 ppm for lead in residential soils in Texas. *See id.* § 350.76(c)(1). Irrespective of which tier is utilized with respect to a release of chemicals of concern, the 500 ppm protective concentration level is the cleanup standard by which all residential soil lead contamination in Texas is to be measured and remediated. *See id.*

With this background information, we now turn to address your questions.

## II.     Authority of TCEQ

Because they are closely related, we will answer your first two questions together. You specifically ask whether TCEQ has the authority to raise the lead cleanup level at this Site from 500 ppm to 640 ppm. *See* Request Letter, *supra* note 1, at 1. You also inquire whether TCEQ can grant a variance such that it changes the cleanup level at this Site, while the level at other sites remains the same. *See id.* We read your questions to ultimately inquire whether TCEQ may apply a cleanup level to the Site that is different from the level established by the TRRP, without changing the TRRP. The nature of your questions assumes that Texas law will set the cleanup level for the Site, which, as we discuss later in this opinion, may not be the case. However, in order to answer your initial questions, we address here the authority of TCEQ acting under state law as the environmental agency of the State of Texas.

You do not question TCEQ's authority to have adopted the TRRP. TCEQ is a creature of statute with no inherent authority. *See Sexton v. Mount Olivet Cemetery Ass'n*, 720 S.W.2d 129, 137 (Tex. App.–Austin 1986, writ ref'd n.r.e.). An agency may exercise only those powers granted it by statute together with those powers necessarily implied from its statutory authority. *See City of Sherman v. Pub. Util. Comm'n of Tex.*, 643 S.W.2d 681, 686 (Tex. 1983); Tex. Att'y Gen. Op. No. JM-903 (1988) at 4. The TRRP was adopted under TCEQ's authority pursuant to sections 5.103, 26.011, 26.039, 26.121, 26.262, 26.264, 26.341, 26.354, and 26.401 of the Texas Water Code, and sections 361.017 and 361.024 of the Health and Safety Code. *See* 24 Tex. Reg. 7743 (1999). These sections provide TCEQ with authority to adopt any rules necessary to carry out its powers, duties and policies to protect water quality and regulate solid waste. We will assume, as you appear to in your request letter, that these statutes sufficiently authorized the TCEQ to initially adopt and implement the TRRP rule.

Once adopted, valid rules of administrative agencies have the same "force and effect of legislation." *Tex. Citrus Exch. v. Sharp*, 955 S.W.2d 164, 169 (Tex. App.–Austin 1997, no pet.);

*Nacogdoches Sav. & Loan Ass'n v. Lewis*, 531 S.W.2d 428, 430 (Tex. App.–Austin 1975), *rev'd on other grounds*, 540 S.W.2d 313 (Tex. 1976). While an agency's interpretation of its own rules is entitled to deference from the courts, *see Pub. Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991), an agency is, nonetheless, bound by its own rules. *See Nacogdoches Sav. & Loan Ass'n*, 531 S.W.2d at 430 (*citing Foley v. Benedict*, 55 S.W.2d 805, 808 (Tex. 1932)); *Flores v. Employees Ret. Sys.*, 74 S.W.3d 532, 542 (Tex. App.–Austin 2002, pet. denied). Moreover, the commission is directed by statute to follow its own rules. *See* TEX. WATER CODE ANN. § 5.103(c) (Vernon Supp. 2004-05); *see also* TEX. HEALTH AND SAFETY CODE ANN. § 361.024(e) (Vernon 2001). Where an agency fails to follow the clear, unambiguous language of its own regulation, its action is arbitrary and capricious. *See Gulf States Utils. Co.*, 809 S.W.2d at 207.

Rule 350.76(c)(1) clearly and unambiguously establishes the protective concentration level, or cleanup standard, for lead in residential soils at 500 ppm.[12] *See* 30 TEX. ADMIN. CODE § 350.76(c)(1) (2004). Though the TRRP is flexible and allows for some site-specificity in state cleanup actions for many chemicals of concern, *see id.* § 350.2(a), it gives special treatment to lead. *See id.* § 350.76(a)(1)(B). Where the protective concentration level for most chemicals of concern can be established using one of the calculations of one of the three tiers, *see id.* § 350.75, the TRRP affirmatively establishes the protective concentration level for lead in residential soils in all three tiers. *See id.* § 350.76(c)(1). Moreover, the TRRP does not contain any exceptions or allow for any variances from the residential lead protective concentration level. Accordingly, any party, including TCEQ, undertaking the cleanup of lead in residential soil in Texas pursuant to the TRRP must use the 500 ppm protective concentration level.

Because TCEQ is bound to its rules, it must apply the 500 ppm standard to all sites in Texas to which the TRRP applies. Applying a cleanup level of 640 ppm in violation of the 500 ppm standard set forth in Rule 350.76(c)(1) would be arbitrary and capricious. Such an arbitrary and capricious action on the part of TCEQ would be subject to judicial reversal. *See* TEX. GOV'T CODE ANN. § 2001.174(2)(F) (Vernon 2000); TEX. HEALTH & SAFETY CODE ANN. §§ 361.321(e) (Vernon 2001) ("the issue is whether the action is invalid, arbitrary or unreasonable"), 361.322(g)-(h) ("action shall be upheld unless the court determines the remedy is arbitrary or unreasonable"); *Gulf States Utils. Co.*, 809 S.W.2d at 210-11. Having created a cleanup standard that applies to residential soils across the state, TCEQ is precluded from applying that standard differently to different sites. *See* TEX. WATER CODE ANN. § 5.103(c) (Vernon Supp. 2004-05); *see also* TEX. HEALTH & SAFETY CODE ANN. § 361.024(e) (Vernon 2001).

### III.    Procedure for Changing Cleanup Level

You next ask, "If TCEQ has the authority to change these levels, what process or guidelines must the agency follow, if any?" Request Letter, *supra* note 1, at 1. As we have concluded, the TRRP does not permit TCEQ to apply a cleanup level other than 500 ppm. TCEQ may authorize a different cleanup level for the state only by amending the TRRP.

---

[12]The protective concentration level for lead in residential soils is treated more stringently than the protective concentration level for lead in commercial/industrial soil. The TRRP provides equations for the calculation of commercial/industrial lead protective concentration levels under Tier 1 or Tier 2 and Tier 3. *See* 30 TEX. ADMIN. CODE § 350.76(c)(2)-(3) (2004).

TCEQ adopted the TRRP pursuant to its rulemaking authority under the Water Code and the Health and Safety Code, *see supra* p. 5, and it may amend the TRRP under the same authority. Because a rule includes an amendment to a prior rule, *see* TEX. GOV'T CODE ANN. § 2001.029(a) (Vernon 2000), should TCEQ decide to amend the TRRP, it must follow the rulemaking procedures of the Texas Administrative Procedure Act. *See* TEX. WATER CODE ANN. § 5.103(c) (Vernon Supp. 2004-05) ("Rules shall be adopted in the manner provided by Chapter 2001, Government Code."); *see also* TEX. HEALTH & SAFETY CODE ANN. § 361.024(e) (Vernon 2001). If any proposed change to the TRRP meets the statutory definition of a "major environmental rule,"[13] then a Final Regulatory Analysis of the rule's impact is also required. TEX. GOV'T CODE ANN. § 2001.0225(d) (Vernon 2000).

## IV.    Effect of EPA Cleanup Level on State Rule

You do not ask about what cleanup standard is to be used at the Site. Instead, you ask if a federal agency raises the cleanup level at the Site, "would the state agency have to make [conforming] changes to their rules."[14] To fully address your question, a more detailed discussion of CERCLA, and its relationship to Rule 350.76(c)(1), is required.

### A.    CERCLA

CERCLA authorizes the President, or the EPA as delegatee of the President, to:

> remove or arrange for the removal of, and provide for remedial action
> relating to such hazardous substance, pollutant, or contaminant at any
> time (including its removal from any contaminated natural resource),
> or to take any other response measure consistent with the national
> contingency plan . . . to protect the public health or welfare or the
> environment.

42 U.S.C. § 9604(a)(1). CERCLA contemplates two types of actions: Removal Actions and Remedial Actions. *See supra* note 4. Whether a response is a Removal Action or a Remedial Action, CERCLA does not affirmatively establish a quantitative nationwide cleanup standard for particular hazardous substances and environmental media. Instead, CERCLA incorporates cleanup

---

[13]"A 'major environmental rule' means a rule the specific intent of which is to protect the environment or reduce risks to human health from environmental exposure and that may adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, or the public health and safety of the state or a sector of the state." TEX. GOV'T CODE ANN. § 2001.0225(g)(3) (Vernon 2000).

[14]Request Letter, *supra* note 1, at 1. Congress has the authority to establish federal cleanup standards, and under the federal Supremacy Doctrine, can impose those standards on the states. *See* U.S. CONST., art. VI, cl. 2. While it has the authority to do so, it has not done so. Instead, it has chosen, through CERCLA, to use the standards dictated by other federal regulations and more stringent state standards. *See* 42 U.S.C. § 9621. We note further that Congress can use its powers of economic inducement to encourage the states to adopt state laws and regulations desired by the Congress. *See West Virginia v. United States Dep't of Health & Human Servs.*, 289 F.3d 281, 286-87 (4th Cir. 2002) ("Congress may use its spending power to encourage the states to act."). We do not read your question to inquire about these possibilities and so do not address them in this opinion.

standards from other federal sources and state sources through the concept of "applicable or relevant and appropriate requirements," or ARARs. *See* 42 U.S.C. § 9621(d)(2)(A) (Remedial Actions); 40 C.F.R. § 300.415(j) (Removal Actions). A Removal Action, such as the one here, shall "to the extent practicable considering the exigencies of the situation, attain applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws." 40 C.F.R. § 300.415(j).

Ultimately, if Rule 350.76(c)(1) is an ARAR under CERCLA, then pursuant to 40 C.F.R. § 300.415(j), the EPA should be required to clean up the residential soils lead at the Site under the state standard. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1439 (6th Cir. 1991). However, that determination is ultimately within the jurisdiction and discretion of EPA. *See* 42 U.S.C. § 9604(a)(1) ("[T]he President is authorized to act . . . to remove . . . such hazardous substance, pollutant, or contaminant . . . ."); *see also* 40 C.F.R. §§ 300.400(g)(1)-(2), 300.415(a)(1) (lead agency to determine appropriate extent of action to be taken in response to a release); *United States v. Fort Lauderdale*, 81 F. Supp. 2d 1348, 1352 n.5 (S.D. Fla. 1999) ("The EPA's determination of whether these state standards are ARARs under federal law is entitled to some deference under *Chevron, USA v. NRDC*, 467 U.S. 837, 843-44 (1984)."). Furthermore, that determination is also dependent on the facts and circumstances of a particular site. *See* Tex. Att'y Gen. Op. No. GA-0139 (2004) at 5 (the opinion process does not resolve questions of fact). Nonetheless, we offer the following analysis of issues that would bear upon EPA's determination.

## B.     Applicable or Relevant and Appropriate Requirements (ARARs)

To constitute an ARAR, a state standard must be (1) promulgated, (2) more stringent than federal standards, (3) legally applicable or relevant and appropriate, and (4) timely identified with respect to a particular site. *See* 40 C.F.R. § 300.400(g)(4); *see also Akzo*, 949 F.2d at 1440.

First, to be viewed as promulgated, Rule 350.76(c)(1) must be legally enforceable and generally applicable. It will be considered legally enforceable if it is based on specific enforcement provisions or the state's general legal authority. *See Akzo*, 949 F.2d at 1440-43. It is generally applicable if it applies to more than just Superfund sites. *See id.* Rule 350.76(c)(1) was adopted by TCEQ under the authority of the state given to it by the legislature in the Texas Water Code and the Health and Safety Code to conserve the state's natural resources and protect the environment. *See supra* p. 5. As such it is derived from the state's general legal authority. Rule 350.76(c)(1) applies to state Superfund sites, but also to contaminated sites involving municipal solid waste, Brownfield initiatives, composting, spill prevention and control, and underground injection control. *See* 30 TEX. ADMIN. CODE § 350.2 (2004). Accordingly, it is our opinion that under Texas law, Rule 350.76(c)(1) is both legally enforceable and generally applicable.

Second, to be determined to be an ARAR, Rule 350.76(c)(1) must also be more stringent than applicable federal standards. *See Akzo*, 949 F.2d at 1443-45. EPA must consider whether any federal act imposes any relevant cleanup standards for the Site. Any applicable federal cleanup standards would then be compared against the standard in Rule 350.76(c)(1), and EPA would determine whether the state standard of 500 ppm was more stringent.

Third, to constitute an ARAR a requirement must either be "applicable"[15] or "relevant and appropriate."[16] 40 C.F.R. § 300.400(g)(2); *see also Franklin County Convention Facilities Auth. v. Premier Underwriters*, 240 F.3d 534, 544 (6th Cir. 2001); *Ohio v. United States Envtl. Prot. Agency*, 997 F.2d 1520, 1526 (D.C. Cir. 1993). Applicable state requirements are those cleanup standards, controls, and other substantive environmental protection requirements, criteria, or limitations promulgated under state law that specifically address a hazardous substance, pollutant or contaminant, remedial action, location, or other circumstance at a Superfund site. *See* 40 C.F.R. § 300.5. To be applicable, "a requirement must directly and fully address a CERCLA activity." *Akzo*, 949 F.2d at 1445-46. We believe that Rule 350.76(c)(1) would be considered applicable to the Site under Texas law.[17] Pursuant to the state's Solid Waste Disposal Act, TCEQ is responsible for the management of lead as a solid waste. *See* TEX. HEALTH & SAFETY CODE ANN. § 361.002 (Vernon 2001). "Solid waste" includes a wide variety of discarded material, including hazardous substances for purposes of the state's Superfund enforcement provisions. *See id.* § 361.003(35). "Hazardous substance" includes "an element, compound, mixture, solution, or substance designated under Section 102 of [CERCLA]." *Id.* § 361.003(11)(A)(ii). Regulations promulgated under section 102 of CERCLA (42 U.S.C. § 9602) include lead as a hazardous substance. *See* 40 C.F.R. § 302.4. Irrespective of its source, the lead in the residential soil at the Site is a solid waste over which TCEQ has jurisdiction. If the Site is ultimately not remediated under CERCLA, TCEQ would have authority to remediate the site under the Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 361.181-.188, 361.271-.273, 361.341 (Vernon 2001 & Supp. 2004-05). Any remediation action under Texas law would have to comply with the standard set by Rule 350.76(c)(1). *See supra* Part II.

Fourth, a potentially more stringent state standard must be timely identified as applicable to a particular site. *See* 40 C.F.R. §§ 300.515(d) (state involvement in Remedial Investigation/Feasibility Study process), 300.515(h)(2) (identification of ARARs and TBCs, or To Be Considered). The question of whether a state standard has been timely identified so that it may be considered an ARAR is for EPA to decide. As a practical matter with respect to the Site, we point out that the Texas standard set by Rule 350.76(c)(1) of 500 ppm in residential soils has likely already been identified.

## C.   ARARs Applicable to Removal Actions

Although ARARs are defined in the same way for purposes of a Removal Action and a Remedial Action, ARARs are used differently under the two actions. A Removal Action is designed to deal with an emergency situation. It has a short time frame and a monetary ceiling, and is "to contribute to the efficient performance of a long-term remedial action, where practicable." 42 U.S.C. § 9604(a)(2); 53 Fed. Reg. 51394, 51409 (1988). A Remedial Action, *see supra* note 4,

---

[15] Applicable requirements are those standards that are promulgated under federal laws that specifically address a hazardous circumstance at a CERCLA site, or relevant state standards that are more stringent than federal requirements. *See* 40 C.F.R. § 300.5.

[16] Relevant and appropriate requirements are those that are "well suited to a particular site" but do not fall within the definition of "applicable." *Id.*

[17] Accordingly, we do not address whether Rule 350.76(c)(1) is "relevant and appropriate" under CERCLA.

is the long-term cleanup action that involves the complete cleanup of a site. *See* 53 Fed. Reg. 51394, 51409 (1988). CERCLA requires that Remedial Actions attain ARARs but does not impose the same requirement on Removal Actions. *See* 42 U.S.C. § 9621. EPA, through its regulations, requires Removal Actions to identify and attain ARARs but only to the extent practicable. *See* 53 Fed. Reg. 51394, 51410 (1988). EPA offers three factors to guide a determination that attainment of ARARs are practicable in a particular situation. Those factors are (1) the exigencies of the situation, (2) the scope of the removal action to be taken, and (3) the effect of ARAR attainment on the statutory limits for duration and costs. *See id.* at 51411.

Under the first factor, urgent and time-critical conditions may constrain or preclude efforts to identify and attain ARARs. *See id.* The federal regulations provide the example of leaking drums that pose an immediate threat of fire or explosion that must be removed immediately, without consideration of any ARAR, to protect human health. *See id.* As an interim remedy, a Removal Action has a more limited scope than a Remedial Action. The second factor focuses narrowly on the "stabilization of a release or threat of a release and mitigation of near-term threats." *Id.* Only ARARs that are within the narrow parameters of the Removal Action must be attained. The third factor takes into consideration the statutory time and monetary limitations on Removal Actions which may preclude the attainments of all ARARs in such an action. *See id.*

The fact that this Site is being evaluated for inclusion on the National Priorities List, *see* EPA Memo, *supra* note 2, at 4, as a possible Remedial Action is also a consideration. CERCLA requires that Removal Actions, to the extent practicable, contribute to the performance of any long-term Remedial Action. *See* 42 U.S.C. § 9604(a)(2). By repeating this requirement in its regulations, *see* 40 C.F.R. § 300.415(c), EPA intends to "avoid repetitive removal actions or actions that do not take into account their impact on performance of subsequent remedial actions, and to allow for more permanent tasks to be completed under removal authorities." 53 Fed. Reg. 51394, 51409-10 (1988). We cannot fully ascertain from your letter and material on EPA's website what precise cleanup activities are planned for the Removal Action and for any subsequent Remedial Action. To the extent that Rule 350.76(c)(1) is an ARAR in any subsequent Remedial Action, its use as an ARAR in the current Removal Action would certainly contribute to the efficient performance of the Remedial Action. However, as we have stated before, this determination is ultimately within the province of EPA.

### D.    Standard Applicable to the Site and Effect on State Law

Because the cleanup at the site is being conducted under CERCLA, the cleanup is governed by federal law.[18] Should the Site ultimately warrant a Remedial Action, CERCLA requires the cleanup of the Site to comply with all ARARs, or "applicable" or "relevant and appropriate" requirements. We believe the state's Rule 350.76(c)(1) cleanup standard is "promulgated" and "legally applicable" as contemplated by CERCLA regulations. If it is more stringent than comparable federal requirements and has been timely identified to EPA, then it should be considered an ARAR and apply to any Remedial Action.

---

[18]If the Site is not remediated under CERCLA, the Texas Health and Safety Code would direct the remediation efforts. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 361.181-.188, 361.271-.273, 361.341 (Vernon 2001 & Supp. 2004-05).

As the action at the Site is still a Removal Action, Rule 350.76(c)(1), if an ARAR, should be the cleanup standard but only to the extent practicable, considering the exigencies of the situation. While we believe the Rule is an ARAR with respect to the final cleanup standard for the Site, it may not apply to this Removal Action if EPA finds it is not practicable given the exigencies of the situation. However, if this action is intended to be the final cleanup of the Site, this statewide standard should apply. In any case, the determination of whether Rule 350.76(c)(1) is an ARAR is ultimately within EPA's discretion.

Your question indicates that you are concerned about the effect of EPA cleanup standards at the Site on Rule 350.76(c)(1). *See* Request Letter, *supra* note 1, at 1. In the event EPA determines that Rule 350.76(c)(1) is not an ARAR, or otherwise decides on some other legal basis to allow a higher lead level to remain at the Site, such an application of federal law would not affect the validity or enforceability of the Rule under Texas law, but would merely control for purposes of remediation at the Site under CERCLA. Thus, in answer to your specific question, "if a federal agency raises the concentration levels for remediation" at the Site, TCEQ would not be required to make conforming changes to the Rule.

## S U M M A R Y

As an administrative agency, the Texas Commission on Environmental Quality ("TCEQ") is bound by its own rules. Where a validly adopted rule, here the Texas Risk Reduction Program ("TRRP") rule, establishes the cleanup standard for remediation activity at all sites in the state, TCEQ's application of a different standard to the ASARCO/El Paso Metals Site without changing the rule would be arbitrary and capricious.

TCEQ is authorized under its enabling legislation to amend the TRRP rule so long as it follows the rulemaking procedures of the Texas Administrative Procedure Act.

As a Removal Action under the federal Comprehensive Environmental Response Compensation and Liability Act, or CERCLA, the current United States Environmental Protection Agency ("EPA") cleanup at the Site is required to meet the lead cleanup standard in title 30 Texas Administrative Code section 350.76(c)(1) to the extent it is practicable to do so given the exigencies of the situation. If EPA determines that the action will be a Remedial Action, or final cleanup, then Rule 350.76(c)(1) sets the applicable cleanup standard. In either case, if EPA determines that Rule 350.76(c)(1) is not applicable to the Site as an applicable or relevant and appropriate requirement, or ARAR, that determination would not require a change in the TRRP rule.

Very truly yours,

G R E G  A B B O T T
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Charlotte M. Harper
Assistant Attorney General, Opinion Committee